# United States Court of Appeals
## For the First Circuit

No. 02-2705

BOBBI-LYN REED

Plaintiff, Appellant,

v.

MBNA MARKETING SYSTEMS, INC.,
MBNA AMERICA BANK, N.A., and
MBNA AMERICA CORPORATION,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Boudin, Chief Judge,

Lipez and Howard, Circuit Judges.

William C. Knowles with whom Robert C. Brooks, Scott W. Boak
and Verrill & Dana, LLP were on brief for appellant.
James R. Erwin with whom Ella L. Brown and Pierce Atwood were
on brief for appellees.

June 19, 2003

**BOUDIN**, <u>Chief Judge</u>. Plaintiff Bobbi-Lyn Reed sued her former employer MBNA Marketing Systems, Inc. and two parent companies (collectively, "MBNA," a major banking institution), claiming that she was sexually harassed by her supervisor, William Appel. The district court granted MBNA's motion for summary judgment, and Reed now appeals. We set forth the facts in the light most favorable to Reed as the party opposing summary judgment. <u>Motorsport Eng'g, Inc.</u> v. <u>Maserati S.p.A.</u>, 316 F.3d 26, 28 (1st Cir. 2002).

Reed began working for MBNA in June 1999 at the age of seventeen. She worked as a telemarketer in the MBNA call center in Orono, Maine, under the supervision of Appel, then aged thirty-four. Almost immediately, Appel started misbehaving. Appel told Reed that "if you ever catch me looking at you funny, it's because you remind me of my ex-girlfriend." Appel also frequently dropped green M&M's on Reed's desk claiming that they would "make [her] horny." He also routinely complimented her on her clothes and appearance, comments which take color from his other remarks.

According to Reed, a far more serious incident followed. In August 1999, Reed went to Appel's house to babysit for his two-year-old son. When Appel returned home, he and Reed talked for a short period and then Reed started to leave. As she was leaving, Appel came up behind her, put his arm around her neck and dragged her into the living room where he pressed her to perform oral sex

-2-

on him.  Afterwards, Appel told Reed that she should not tell anyone what had happened or they would both be fired, adding that his family had influence with the head of the company; the details of what Appel said are recounted below.

Reed did not report the incident, and Appel ignored Reed at work for a few days thereafter.  Soon, Appel again began making sexual comments to her, leaving green M&M's on her desk, and asking Reed to babysit for him.  Reed stated later that these comments were "an everyday thing. . . . He always made a comment to me about something every day."  In the fall of 1999, Reed took a job elsewhere and left MBNA without informing anyone there that Appel had harassed or assaulted her.  She claims that she left "because of everything that happened because I was scared and I didn't know how he would act. . . . I was reminded of it every day because he wouldn't stop . . . all the comments."

Reed returned to work at MBNA in May 2000 because she needed to make more money than she was earning at her other job. She was re-assigned to Appel's team.  After a few weeks Appel resumed his earlier comments on her appearance and his practice of dropping green M&M's on her desk.  In August 2000, Appel called Reed into his office, asked if she would babysit for him again, and told her that she looked like she needed to wrestle.  Reed refused and claims that thereafter Appel's attitude became "really mean,"

yelling at her for coming in late to work or wearing khakis, conduct that he had previously tolerated.

On August 28, 2000, Reed told MBNA officials about Appel's behavior including his assault of the year before and she requested a transfer. Reed says that she decided to come forward because she heard that Appel was asking other young women who worked on his team to babysit for him and she was afraid that they would be sexually assaulted as well. MBNA began an investigation that day leading swiftly to a decision to terminate Appel. Appel resigned before the paperwork for his dismissal could be completed.

Reed continued to work at MBNA. On February 22, 2001, she filed a discrimination charge with the Maine Human Rights Commission, but the Commission declined to pursue the complaint. Reed left MBNA in June 2001, and on December 11, 2001, Reed filed the present suit against MBNA in state court, making claims under Title VII, 42 U.S.C. § 2000e-2(a)(1) (2000)--the federal employment discrimination statute--and under the Maine Human Rights Act, Me. Rev. Stat. tit. 5, § 4572(1)(A) (2000), which the parties treat as coextensive with Title VII for present purposes. Other claims were made but are not pertinent to this appeal.

After removal of the case to federal court and discovery, the district court granted MBNA's motion for summary judgment. Reed v. MBNA Mktg. Sys., Inc., 231 F. Supp. 2d 363, 375-76 (D. Me. 2002). The court held that, although Appel's conduct was

sufficiently severe or pervasive to alter Reed's terms and conditions of employment, id. at 371-72, MBNA was not vicariously liable for his conduct. The court found that, first, Reed did not suffer "a tangible employment action"--a term of art in the case law--and, second, the company took reasonable care to prevent and correct sexually harassing behavior and Reed unreasonably failed to invoke the company's corrective mechanism. Id. at 372-75. Reed now appeals.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Although Title VII does not in its terms address sexual harassment, the Supreme Court has read the statute to include such conduct as a form of gender discrimination where, inter alia, it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998). For purposes of this appeal MBNA does not dispute that Appel's conduct met this test; it does deny that it is vicariously liable for this harassment.

In two cases decided in 1998--Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Industries v. Ellerth, 524

-5-

U.S. 742 (1998)--the Supreme Court itself devised a special framework for imposing vicarious liability on employers in cases involving harassment by supervisors.[1] The rules although unique were not made up entirely out of whole cloth; rather, the new regime was stitched together out of disparate pieces of older law, including older common-law agency doctrines, selected judicial precedent (the pre-1998 cases offering a range of options), administrative regulations and multiple (but conflicting) policy concerns. E.g., Faragher, 524 U.S. at 788-806. The common language, identical in both opinions, follows:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule. Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every

---

[1]Ordinarily, where sexual harassment is by a non-supervisory co-worker, the employer is liable only if the plaintiff can demonstrate that the employer was negligent, i.e., that it "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action." Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002).

> instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

Id. at 807-08; Ellerth, 524 U.S. at 764-65.

Notice, at the outset, that the affirmative defense does not apply where a "tangible employment action" is taken against the employee--for example, where in the course of the harassment, the supervisor illegitimately fires or demotes the employee. Ellerth offered as instances of such tangible job action the following: "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761. The reason for the exclusion, relevant to the first issue before us, is importantly that the supervisor in such a case is exercising official authority even if doing so for improper purposes; and, in this instance, the courts treat the act as that of the employer, a course finding some limited basis in traditional agency law. Id. at 761-62.

-7-

Reed was not fired or demoted but she seeks to bring herself within this category of tangible employment action by describing her initial departure from the job in fall 1999 as a "constructive discharge."  The phrase "constructive discharge" usually describes harassment so severe and oppressive that staying on the job while seeking redress––the rule save in exceptional cases--is "intolerable," Keeler v. Putnam Fiduciary Trust Co., 238 F.3d 5, 9-10 (1st Cir. 2001); and the concept has been used for various purposes, such as allowing the employee to claim damages not only for emotional harm due to the harassment but also for lost wages after departure.  Melendez-Arroyo v. Cutler-Hammer de P.R. Co., 273 F.3d 30, 36 (1st Cir. 2001).

Here, the district court rejected Reed's claim that, by calling the conduct here a constructive discharge, she could avoid MBNA's effort to prove an affirmative defense.  Case law in the Third and Eighth Circuits treats constructive discharge as a tangible employment action; cases in the Second and Sixth Circuits lean the other way.[2]  Because the conduct differs from case to case, we see no reason to adopt a blanket rule one way or the other.  Here, it is clear to us that the constructive discharge

[2]Compare Suders v. Easton, 325 F.3d 432, 447-62 (3d Cir. 2003) and Jackson v. Ark. Dep't of Educ., 272 F.3d 1020, 1026 (8th Cir. 2001), cert. denied, 536 U.S. 908 (2002), with Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 293-95 (2d Cir. 1999), cert. denied, 529 U.S. 1107 (2000) and Turner v. Dowbrands, Inc., 2000 U.S. App. LEXIS 15733, at *4 (6th Cir. June 26, 2000).

label cannot be used to preclude the affirmative defense; but possibly, on rare facts, it might be appropriate for that purpose.

Nothing is gained by arguing in the abstract about whether a constructive discharge is or is not a discharge; for some purposes or rubrics, it might be so treated, e.g., Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 480 (1st Cir. 1993), and for others not. What matters is the Supreme Court's rationale for excluding tangible employment actions from the affirmative defense, namely, that a supervisor who takes official action against an employee should be treated as acting for the employer. Ellerth, 524 U.S. at 761. There might indeed be cases in which official actions by the supervisor--e.g., an extremely dangerous job assignment to retaliate for spurned advances--could make employment intolerable, but nothing like that is present here.

Rather, all of Appel's conduct was exceedingly unofficial and involved no direct exercise of company authority. With one possible qualification to which we will return, this premise is so clear that no extended discussion is needed. Thus, Appel's behavior is exactly the kind of wholly unauthorized conduct for which the affirmative defense was designed. Yes, Appel's supervisory status may have facilitated his harassment, but that is a reason for vicarious liability, Ellerth, 524 U.S. at 763-64, not for bypassing the affirmative defense. Whether the conduct bears

on the reasonableness of <u>Reed's</u> inaction in failing earlier to report Appel is a different question.

Reed claims--and this is the possible qualification--that even if official action is needed for a tangible employment action, here Appel told her that they would both be fired if she reported the assault. However, we think that this issue is controlled by the Supreme Court's statement in <u>Ellerth</u> that "unfulfilled threats" are not tangible employment actions. 524 U.S. at 754. The Court also stated that the concept of a tangible employment action is based on the distinction between "cases in which threats are carried out and those where they are not or are absent altogether." <u>Id.</u> at 751.[3]

This brings us to the affirmative defense itself and we start with the first prong: that the employer prove that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior . . . ." <u>Ellerth</u>, 524 U.S. at 765. Although the burden of proof lies on the employer as to both prongs of the affirmative defense, summary judgment for the employer is still possible so long as raw facts are undisputed or assumed in favor of the plaintiff. Even then, however, the judgment call as to reasonableness is itself a jury issue unless no reasonable jury

_____

[3]We therefore need not address MBNA's claim that the constructive discharge claim is barred by Title VII's requirement that claims under the statute be filed within 300 days from the date of the unlawful employment practice. <u>See</u> 42 U.S.C. § 2000e-5(e)(1) (2000).

could decide it in the plaintiff's favor.  <u>Mota</u> v. <u>Univ. of Tex.</u> <u>Houston Health Sci. Ctr.</u>, 261 F.3d 512, 525 (5th Cir. 2001).

On the merits, the district court ruled that MBNA did take reasonable precautions to prevent and correct promptly any sexually harassing behavior by its employees.  The district court noted that MBNA had a policy against sexual harassment and a procedure that called for employees to present complaints either to their manager or directly to MBNA Personnel Department officials. This gave Reed an alternative route around Appel even if complaining to Appel's own manager was infeasible.  MBNA offered evidence, by means proper at the summary judgment stage, both of its own procedures and of its efforts to publicize them.

Reed admitted in her deposition that she attended an orientation on MBNA's sexual harassment policies before she started working at the company in 1999 and again when she returned in 2000. She also told an investigator with the Maine Human Rights Commission that MBNA stressed its sexual harassment policies.  She conceded that she saw posters regarding sexual harassment in the workplace and knew she could go to personnel if she was sexually harassed.  In any event, MBNA began an investigation the day that Reed reported Appel's conduct, and Reed concedes that Appel was removed from the workplace almost immediately.

Reed argues that, although MBNA's policies were fine in theory, they failed in practice. She claims that several employees reported Appel's inappropriate conduct but MBNA never took any action. However, although these reports indicated that Appel was not a model manager, only one related to sexual harassment. In that instance Appel's conduct, while patently improper, was largely confined to remarks freighted with sexual innuendo made to (or in the presence of) another female subordinate. When the employee complained in October 1999, MBNA investigated the episode and reprimanded Appel, warning him against such remarks in the future.[4]

Reed says the MBNA should have taken stronger measures at that time and objects in particular to the deposition statement of the investigating MBNA personnel official that "[i]f there is any shadow of a doubt, then we give the doubt to the person because we are not going to place someone on corrective action if we are not 100 percent sure." This statement, whatever its advisability if treated as a general company policy, was made simply in explaining why Appel--after Reed reported his harassment to personnel--was given the opportunity to respond to her allegations. It does not show that MBNA lacked a substantial anti-harassment program, and

_____

[4]In January 2000, the same employee complained again about a single remark by Appel which may have been tame or off-color, depending on which version of the employee's recollection is credited. The version in the Personnel Department notes records the tamer version, but in any event personnel officials nevertheless interviewed every member of Appel's team, received generally favorable reports, and took no action.

thus we agree with the district court that MBNA satisfied the first prong of the affirmative defense.

The crux of this appeal concerns the second prong of the affirmative defense. MBNA argues that Reed unreasonably failed to take advantage of the company's sexual harassment policy, which explicitly provided that employees who were sexually harassed should report that harassment to their manager or directly to personnel and that this could be done on a confidential basis. In contrast, arguing that reasonableness is at least a jury issue, Reed points to her age, embarrassment, Appel's threat that they would both be fired, and his claim of family friendship with MBNA's owner. The district court responded as follows:

> The reasons listed above, however, are not enough to excuse Plaintiff from following the procedures adopted for her protection. Given MBNA's practice of handling complaints confidentially, the fact that Plaintiff was too embarrassed or ashamed to tell anyone does not constitute a valid reason for avoiding the company's channels for dealing with sexual harassment. Furthermore, even if Plaintiff feared retaliation or further humiliation, no evidence suggests that Defendants' procedures were inadequate. In fact, in addition to directly addressing sexual harassment, Defendants' policy did not require that complaints be filed with an immediate supervisor, or for that matter, even management. Therefore, Plaintiff's excuse that she was intimidated by Appel and his close relationship to MBNA management is not reasonable.

Reed, 231 F. Supp. 2d at 375.

-13-

There is no bright-line rule as to when a failure to file a complaint becomes unreasonable, but Faragher and Ellerth do provide some indirect guidance. Reporting sexually offensive conduct by a supervisor would for many or most employees be uncomfortable, scary or both. But because this will often or ordinarily be true, as the Supreme Court certainly knew, its regime necessarily requires the employee in normal circumstances to make this painful effort if the employee wants to impose vicarious liability on the employer and collect damages under Title VII. In short, for policy reasons representing a compromise, more than ordinary fear or embarrassment is needed. See, e.g., Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 270 (4th Cir. 2001).

Several courts have therefore focused on whether the employee had concrete reason to apprehend that complaint would be useless or result in affirmative harm to the complainant. The Second Circuit has stated, "there are many reasons why a victimized employee may be reluctant to report acts of workplace harassment, but for that reluctance to preclude the employer's affirmative defense, it must be based on apprehension of what the employer might do," specifically, on a "credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint." Caridad, 191 F.3d at 295; see also Matvia, 259 F.3d at 270 (holding that a

-14-

"nebulous fear" of retaliation is not an adequate basis for remaining silent).

Yet sometimes inaction is reasonable--this is the Supreme Court's premise--and circuit case law is now emerging. In Mota, the plaintiff was a visiting professor who was sexually harassed by the department head who then told the plaintiff that the university would defend the department head against any type of complaint brought against him, as it had allegedly done in the past, and that he had "helped" certain people whom he did not like leave the school. Mota, 261 F.3d at 516. The court concluded that the jury's finding that the plaintiff's failure to avail himself of available remedies was not unreasonable given the department head's "repeated threats of retaliation" and "influence at the university." Id. at 525-26.

Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir. 1998), is analogous. There the plaintiff (a functionally illiterate immigrant) was verbally and physically harassed by a co-worker and reported some of the harassing acts to her immediate supervisor, who first stated that she was crazy and then told her that she should not say anything further about it or she would lose her job. Id. at 59-60. The company argued that she unreasonably failed to report the later harassing acts to the supervisor. Instead, the court ruled that "the jury could find that [the plaintiff] . . . believed that she would lose her job if she

reported further incidents to [the supervisor]" and, if so, the failure to report was excusable.  Id. at 64-65.

The approach taken in Mota and Distasio cannot be pressed too far:  general statements by a supervisor that a complaint will be futile or will get the employee in trouble cannot be an automatic excuse for failing to use the complaint mechanism. Claims of futility or adverse consequences have to be "credible," Caridad, 191 F.3d at 295.  The complaint mechanism, after all, can be used to address threats of retaliation as well as harassment, and unless patently futile, concerns as to whether the complaint mechanism will fail can be tested by trying it out if failure is the only cost.  But where there is a truly credible threat of retaliation that the complaint mechanism will not prevent, the employee's position is more hazardous and inaction more easily explained.

We must assess the reasonableness of Reed's failure to report Appel's actions at two points; first, in summer 1999 before Reed was sexually assaulted (but during which period Appel was making mildly harassing comments), and second, in fall 1999 after the sexual assault.  The failure to report Appel in the summer of 1999 is significant because it might have prevented everything that followed.  See Savino v. C.P. Hall Co., 199 F.3d 925, 935 (7th Cir. 1999).  And, as at this point Appel had made no threats nor inflicted a physical assault, fear cannot justify the failure to

-16-

complain. However, Reed could reasonably have regarded this initial low-level harassment as not worth reporting; indeed, standing alone, it may not have triggered Title VII liability at all. Thus the failure to report at this stage was not unreasonable. See, e.g., Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).

The failure to report the assault itself is a much harder question; on summary judgment, where our review is de novo, the issue is whether a reasonable jury, resolving credibility and inference issues in her favor, could choose to side with Reed. Distasio, 157 F.3d at 64-65. The alleged threat by Appel--that they would both be fired if she reported his assault--is arguably less plausible than the more straightforward threats of retaliation in Mota and Distasio; and, objectively, Appel's claim of family influence with the company might also seem flimsy in relation to what on Reed's account was a serious criminal act. And, we agree with the district court that embarrassment alone was not an excuse.

But this is not the whole story. Crediting Reed's version of events, as we must do on summary judgment, she was a seventeen year old who had just been assaulted by a supervisor twice her age. In addition to inflicting this trauma, he then threatened her with discharge, telling her that they would both be

fired if she reported his actions.[5]  He then told her that he had previously worked at an MBNA office in Delaware, but that a rumor began in that office that he had gotten a young woman there pregnant.  Appel claimed that the rumor was false but stated that his father was "really good friends" with the owner of MBNA and therefore MBNA transferred him to Maine to "cover his tracks."  To an outsider, especially one of maturity and established position, this threat might seem hogwash; but the question remains whether this threat of retaliation coupled with a purported claim of family influence in fact frightened Reed and, if so, whether her submission to the threat was objectively unreasonable for one in her position.

Despite our respect for the district court's judgment, we cannot say that a jury would be acting irrationally if (as the record stands) it resolved factual doubts in her favor and concluded that Reed was actually cowed by the threat and reasonably so.  Admittedly, the second prong of the defense creates a loophole for false or overstated claims of threat by one hoping to reach a sympathetic jury.  But juries are supposed to be good at detecting

_____

[5]Reed now claims that Appel said that only she would be fired if she reported his actions.  However, her own statement of material facts stated that "Appel repeatedly told Reed that what happened needed to stay between them or else they would both get in trouble at work and that both would be dismissed." (emphasis added).  Similarly, Reed stated in her deposition that "he said that what just happened, that needed to stay between him and I or else we could both get in trouble at work."  (emphasis added).

false claims and at evaluating reasonable behavior in human situations.  In any event the Supreme Court's compromise solution binds us.

MBNA may at trial prevail on its affirmative defense.  As the record now stands (and the trial record may look different), the jury might well conclude that in fact Reed was not traumatized or even greatly concerned about the threat.  Inferences in this direction exist based <u>inter alia</u> on the delay in Reed's departure, the fact of her return, her further delay in complaining, and in her explanations for various actions.  Or, the jury might conclude that whatever Reed's state of mind, a reasonable person in her position would have reported Appel's assault.  All we can say now is that a triable issue exists as to the second prong of the affirmative defense.

We do not minimize the difficulties of presenting the issue to a jury.  Admissibility issues and instruction drafting are likely to pose problems; but, as in learning to ride a bike, matters will improve with experience.  It is worth adding that the remand is a close call and the result does not lessen our appreciation for the district court's thoughtful opinion with which, on all other issues, we agree.

The judgment of the district court is vacated and the matter remanded for further proceedings consistent with this decision.

<u>It is so ordered.</u>