EBEL, Circuit Judge,
dissenting:
I respectfully dissent because I believe there is enough evidence in this case to raise genuine issues of fact as to (1) whether CDOT is entitled to the Ellerth/Faragher affirmative defense on Ms. Pinkerton’s claim for a hostile work environment, and (2) whether CDOT’s firing of Ms. Pinkerton was in retaliation for her filing a complaint with CDOT’s internal Equal Opportunity Office.
I. Sexual Harassment Claim
Generally, “[a]n employer is subject to vicarious liability ... for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.” Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In Ellerth and Faragher, the Supreme Court established an affirmative defense allowing an employer to avoid liability on a hostile work environment claim when no tangible employment action is taken against the plaintiff. See Ellerth, 524 U.S. at 765, 118 S.Ct. 2257; Faragher, 524 U.S. at 807, 118 S.Ct. 2275. The Ellerth/Faragher affirmative defense “comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.” Gunnell v. Utah Valley State Coll, 152 F.3d 1253, 1261 (10th Cir.1998) (emphasis added; quotation omitted). If a genuine issue of fact exists as to either element, then Pinkerton is entitled to a trial on the merits of her hostile work environment claim.
Even if CDOT can satisfy the first element of the Ellerth/Faragher affirmative defense, as the majority contends, CDOT can not show an absence of a genuine issue of fact as to the second. As the Court of Appeals for the D.C. Circuit has correctly recognized,
[the second element of the affirmative defense] is not intended to punish the plaintiff merely for being dilatory. Rather, it “reflects an ... obvious policy imported from the general theory of damages,” namely, that the victim has a duty to mitigate her damages. “If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and ... no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.”
Greene v. Dalton, 164 F.3d 671, 674 (D.C.Cir.1999) (quoting Faragher, 524 U.S. at 806-07, 118 S.Ct. 2275) (citation omitted).
When the initial incidents of harassment constitute low-level harassment, which, standing alone, may not trigger Title VII hostile work environment liability, the failure to report at that stage is not necessarily unreasonable. See, e.g., Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 36-37 (1st Cir.2003) (genuine issue of fact existed over whether failure to report was reasonable after two months of mildly harassing comments); Watts v. Kroger Co., 170 F.3d 505, 510-11 (5th Cir.1999) (holding that, even though some sexual harassment occurred in 1993, it intensified in the spring of 1994 and a jury could find that waiting to complain until July 7, 1994, was- not unreasonable as a matter of law). Ultimately, “[t]here is no bright-line rule as to when a failure to file a complaint [as a *1068 result of harassing conduct] becomes unreasonable.” Reed, 333 F.3d at 35. Instead, to determine reasonableness, an employee’s response to harassing conduct must be determined by reference to many factors: for example, the length of time that elapsed before filing the complaint, the nature of the harassment and particularly the initial stages of the harassment, the accessibility and efficacy of a mechanism for reporting and resolving complaints of sexual harassment, and the plaintiffs own efforts to stop or avoid escalation of the harassment short of filing a complaint under the defendant’s reporting mechanism.
At this stage of the proceedings, a genuine issue of fact exists over whether Ms. Pinkerton timely complained to CDOT’s internal civil rights office regarding Mr. Martinez’s harassing comments. Because CDOT has the burden of establishing both prongs of the Ellerbh/Faragher defense, and it has not established that there is no genuine dispute as to the second prong, CDOT should not be entitled to summary judgment based upon its Ellerth/Faragher defense.
As the majority opinion details, Mr. Martinez’s first sexually inappropriate remarks to Ms. Pinkerton occurred during a “project ride” when they were alone in December 2002. (3 Aplt.App. 662.) Mr. Martinez asked whether she had sexual urges and how she could be divorced for so long and live without men. (3 Aplt.App. 603, 609.) Ms. Pinkerton responded that Mr. Martinez’s comments were personal questions and told him that he should not ask her such questions. (3 Aplt.App. 609.) The next comments were not until the next month, on January 6, 2003, when Mr. Martinez asked her about her breast size and commented to her about another man waving at her. (3 Aplt.App. 603.) A few days later, Mr. Martinez made more inappropriate comments, such as trying to tell her about a married woman who had “come on” to him. (3 Aplt.App. 603.) Ms. Pinkerton told him that she did not care to hear his story, and stopped the conversation. (3 Aplt.App. 603, 609, 667.) Sometime after these incidents, Mr. Martinez called Ms. Pinkerton into his office and tried to close the door. (3 Aplt.App. 603.) Ms. Pinkerton told him not to close the door because she felt uncomfortable. (3 Aplt.App. 603, 770.) Additionally, Mr. Martinez told Ms. Pinkerton that he liked it when she wore skirts and asked her if she masturbated and if she had breast enlargements, although it is not clear from the record when these comments occurred. (3 Aplt.App. 658, 667.) When Mr. Martinez brought up these sexually inappropriate topics, Ms. Pinkerton told him that these questions were personal. (3 Aplt. App. 663.)
Ms. Pinkerton contacted Mr. Eugene Trujillo, CDOT’s internal civil rights administrator, and met him in his office on February 19, 2003, to report Mr. Martinez’s harassment. (3 Aplt.App. 609, 664.) The next and final incident happened later that week, when Mr. Martinez asked to go to Ms. Pinkerton’s house for lunch. (3 Aplt.App. 603-04, 610.) Ms. Pinkerton responded to Mr. Martinez’s attempt to have lunch at her house by rebuking him that no one from work ever comes to her house. (3 Aplt.App. 603.) On February 21, 2003, she contacted Mr. Trujillo again to recount this latest incident and inform him that she had decided to file a formal written complaint. (3 Aplt.App. 609, 663-64.) She subsequently filed a formal written complaint on February 24, 2003. (3 Aplt.App. 603-04.)
All of the above comments by Mr. Martinez were inappropriate and contributed to a hostile work environment. But a hostile work environment must be intolerable, and often it may take more than one inap *1069 propriate statement for the environment to become intolerable. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir.2000) (indicating that a Title VII plaintiff can establish actionable sexual harassment based upon “a single incident [of sexual harassment that] was extraordinarily severe”). While one statement may be sufficient in a given situation to constitute actionable harassment, id., here the first statement in December was not sufficient to create a hostile work environment. A hostile work environment might have been created by early January, but that might not have been clear to Ms. Pinkerton given that a month had gone by since the first incident. However, the hostile work environment became unequivocal when Mr. Martinez asked to go to her house for lunch. This incident reasonably could have been interpreted as a request for Ms. Pinkerton to take concrete action on his advances, or as a request for quid pro quo.
On this record, a jury could conclude that when Ms. Pinkerton reported the harassment to CDOT’s internal EO Office on February 19, 2003, and later when she filed a formal written complaint on February 24, 2003, she was acting in a timely manner because only then had it become reasonably apparent that she could not stop Mr. Martinez’s inappropriate conduct toward her by her own expressed disapproval of his conduct, and only then had Mr. Martinez’s conduct unambiguously created a hostile work environment. Therefore, a jury could ultimately conclude that her response to Mr. Martinez’s harassment was timely.
II. Title VII Retaliation Claim
In upholding the dismissal of Ms. Pinkerton’s retaliation claim, the majority states that temporal proximity between protected conduct and adverse action is never enough by itself to create a genuine issue of fact on whether an employer’s proffered reason for termination is pretextual. (Maj. opin. at 1066.) For this proposition the majority relies on Annett v. Univ. of Kan., 371 F.3d 1233 (10th Cir.2004), a case dealing with a plaintiffs claim that an employer’s failure to hire her for a position was retaliatory. In my opinion, Arnett’s holding that temporal proximity alone is never sufficient to defeat summary judgment is limited to the failure-to-hire context in which that case arose.
It is a jury’s function to determine whether an employer acted with a retaliatory motive, and it is not reasonable to contend that temporal proximity is never sufficient evidence for the jury to infer retaliation. Once a defendant has proffered a legitimate, non-discriminatory reason for the employment action, a plaintiff assumes the “normal burden of any plaintiff to prove his or her case at trial.” EEOC v. Flasher Co., Inc., 986 F.2d 1312, 1316 (10th Cir.1992). When the temporal proximity is dramatic, as it is here, the plaintiff should have the opportunity to argue her case to the jury and attempt to cross-examine the defendant to discredit the defendant’s explanation for the employment decision.
A failure-to-hire situation is very different because, in that context, an employer has failed to do something — i.e., failed to hire or promote the plaintiff. A failure to act presents many of the problems normally associated with proving a negative. It is also harder to tie a failure to act to a precise time period. Finally, inaction is inherently more ambiguous than action. Thus, it may have been appropriate in Annett for our court to conclude that mere temporal proximity is not enough by itself to go to the jury on the issue of retaliatory motive in a failure-to-hire case.
But here we have quite a different situation. We have an affirmative act, which was discrete in time and which was unambiguous. Wdien Ms. Pinkerton filed her *1070 complaint with her employer, she was fired within days of its verification. The jury may, or may not, believe her employer’s explanation of why the firing occurred so close to Ms. Pinkerton’s complaint, but that is for the jury to decide.
In any event, here Ms. Pinkerton has offered other evidence, which, in connection with the evidence of temporal proximity, raises an issue of material fact as to whether Ms. Harding’s proffered reason for termination — poor job performance — is unworthy of belief. See Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir.2000) (evidence of temporal proximity in combination with other evidence of pretext is sufficient to defeat summary judgment). First, Ms. Harding testified that the most serious error leading to Ms. Pinkerton’s termination was an allegedly mishandled call from an employee’s daughter that occurred approximately four years before her termination. (3 Aplt.App. 645-46.) Second, Ms. Harding attempted to get Ms. Pinkerton another placement within CDOT only months before she was fired. A reasonable jury could conclude that the very close temporal proximity in this case between her complaint and her termination, along with the doubt that these incidents raise about the bona fídes of Ms. Harding’s justification for Ms. Pinkerton’s termination, establishes that CDOT’s proffered explanation for Ms. Pinkerton’s discharge is unworthy of credence. Each case turns on its facts, and when, as here, the temporal proximity is very close, and when there is also credible doubt about the plausibility of an employer’s proffered reason for adverse action, there is sufficient evidence to create a genuine issue of fact on a plaintiffs claim, and those issues should be resolved by a jury.