ROGERS, Circuit Judge,
dissenting.
Because a reasonable jury could find in appellant Ruby Taylor’s favor, I would reverse the grant of summary judgment. This is clear but for the court’s failure in three instances to apply the correct legal standards.
I.
Upon review of the grant of summary judgment, it is not the role of the court to evaluate and weigh the proffered evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, this court must view the evidence before the district court in the light most favorable to the non-moving party — here, Taylor — and must accord her the benefit of all reasonable inferences. Id. at 255, 106 S.Ct. 2505; Salazar v. Washington Metro. Transit Auth., 401 F.3d 504, 507 (D.C.Cir.2005). Yet the court has done the opposite, presenting the evidence in the light most unfavorable to Taylor and denying her the benefit of the reasonable inferences to which she is entitled. How else could the court conclude, for instance, that Taylor was the cause of the temporary denial of a week’s pay when she proffered evidence that she had cleared her leave from work with her supervisor in advance, that she had successfully requested leave in a similar fashion on prior occasions, and that her supervisor remembered approving the leave request? This example is only one of several that demonstrates the manner in which applying the wrong standard of review infects the court’s analysis.
Applying the correct standard of review, the evidence shows that Taylor had been an auditor for approximately ten years and had received an outstanding performance evaluation in 2001. In a nutshell, she proffered evidence that she had been subject to casual sexual harassment by Robert Bacon beginning in the fall of 2001, that she was not fully informed of her options *1304 under her employer’s sexual harassment procedures, that her harasser used his supervisory authority to intimidate her by suggesting that if she formally complained about his harassment she would be punished and not him, that she complained to a member of management, David Smith, who did not recommend she report the harassment to anyone else, and that when the harassment intensified in the winter of 2001-02 to the point of becoming physically threatening, she filed a formal complaint in April 2002, as her employer’s policy contemplated. Her fear that her supervisors would retaliate if she filed a formal complaint was realized soon thereafter. For example, Robert Joy, the manager of the Pre-termination Process Division in which Taylor worked, refused to recommend her for a job with another supervisor and told her harasser she had lied. Bennie Hagans, the head of the Insurance Operations Department and Joy’s superi- or, warned her about her “negative behaviors.” Her immediate supervisor, Jonathan Henkel, required for the first time that she submit biweekly reports of her progress on pending cases, which since she filed her complaint had consisted of less desirable, low priority cases. Her work was reviewed more slowly, even though her performance evaluations turned on productivity, with the result that she was downgraded from “outstanding” to “excellent” in 2002 and further downgraded to “fully effective” in 2003. Then, a mere two and one half months after she filed a complaint in the district court, she was denied a week’s pay for an unknown period of time when Henkel placed on absent without leave (“AWOL”) status, even though she had obtained leave permission from him in advance and he recalled approving it. Taylor filed a second complaint in February 2004.
Viewing this evidence in the aggregate and according Taylor favorable inferences, a reasonable jury could find she proved hostile environment sex discrimination and retaliation. For purposes of surviving summary judgment, she has overcome the two hurdles that the court identifies.
II.
Delay in reporting sexual harassment. On the question whether Taylor’s sexual harassment claims are barred because of her delay in filing a formal complaint, this court held in Greene v. Dalton, 164 F.3d 671 (D.C.Cir.1999), that an employer is not entitled to summary judgment under the second element of a Faragher/Ellerth affirmative defense[1] unless it shows that, “as a matter of law, a reasonable person in [the employee’s] place would have come forward early enough to prevent [the] harassment from becoming’ severe or pervasive,’ ” id. at 675. This is an objective standard, and a genuine issue of material fact remains as to whether a reasonable person in Taylor’s position would have reported any occurrences prior to the April 5, 2002 copy room incident. Contrary to binding precedent, however, the court converts this objective standard into one that is subjective, Op. at 1319 and so errs. See LaShawn A. v. Barry, 87 F.3d 1389, 1395 (D.C.Cir.1996) (en banc).
*1305 Roebuck v. Washington, 408 F.3d 790 (D.C.Cir.2005), is instructive in demonstrating there is a material issue of disputed fact. There, Linda Roebuck, an administrative assistant in the D.C. Department of Corrections, alleged her supervisor Mr. Corbett had sexually harassed her, id. at 791. Roebuck presented evidence that Corbett had sexually harassed her “off and on,” id., for almost two years beginning in 1995, id. When he was promoted to Deputy Warden in August 1997, he requested Roebuck’s transfer to his office and “resumed harassing her.” Id. During October 1997 through January of the following year, his harassment intensified. For example, he left a note reading “Sexy” on a stack of her work assignments, made suggestive hand gestures, and several times tried to kiss her. Id. at 791-92. The final straw came on January 16, when Corbett called Roebuck into his office, where he had “bedroom music” playing, and simply stared at her, saying nothing. Id. at 792. When Roebuck asked what he wanted, he just kept staring. Id. Roebuck left, but Corbett immediately called her back and resumed his silent staring. Id. On January 21, Roebuck formally complained to a lieutenant that Corbett was sexually harassing her. Id. The jury rejected her claims against her employer, finding that two years was an unreasonable amount of time to wait to file a complaint. Id. Although this court affirmed, it concluded that “[ujpon this record, a reasonable jury certainly could have found in Roebuck’s favor.” Id. at 796 (emphasis added). Cf. Watts v. Kroger Co., 170 F.3d 505 (5th Cir.1999).
Assuming the truth of the statements proffered by Taylor, see Greene, 164 F.3d at 674, and granting her all favorable inferences from her evidence, Anderson, 477 U.S. at 255, 106 S.Ct. 2505, Taylor’s case bears a striking resemblance to the escalating harassment in Roebuck, and a reasonable jury “could certainly [find]” in Taylor’s favor, concluding that a reasonable person in her position would not have reported Bacon’s conduct prior to April 2002, when his harassment intensified and assumed a more dangerous and threatening character than it had before. The “off and on” 2001 incidents were fleeting and resembled the “simple teasing” and “offhand comments” that do not amount to actionable harassment, Faragher, 524 U.S. at 788, 118 S.Ct. 2275, and a jury might well find a reasonable person would not report them. The April incidents, by contrast, were more explicit and physically charged, centering on Taylor’s physical appearance, and occurred on consecutive days. On April 3, Bacon told Taylor that she was “flaunting that black,” referring to her exposed arms. On April 4, when she turned her head but not her body to acknowledge him as he came into her office, he motioned with his hand that she should turn around. After she refused, he kept motioning with his hand that she should turn around, saying, “What did I tell you about turning your back to me? You’d better turn around when I’m talking to you.” Taylor averred that “this was the entire conversation,” and that he wanted her to turn around so that he could see her chest and legs. On April 5, the two met in the copy room, at which point Bacon approached her with his hands raised as if he were going to choke her. When she told him not to touch her, he said, “I’ll touch you if I want to. I can do what I want to.” During that incident, he also called her “baby” and told her to “go ahead [and report him]. Go tell Robert [Bacon’s supervisor]. He won’t do anything. He likes me too much.” Taylor formally reported this behavior on April 9.
This increasingly physical and aggressive series of April incidents stand in stark contrast to prior incidents — the most serious of which were the “red all over” com *1306 ment made, not by Bacon, but by Taylor’s coworker whom Bacon awarded with bonus points for the “embarrassing” moment, and Bacon’s inquiry after she received an outstanding performance evaluation about what was she going to do for him. Other incidents were on the level of Bacon mentioning to Taylor that he wanted to be “her friend” or that she did not actually love her fiance and that he could “beat him,” conduct that could be described as casual “off and on” harassment, Roebuck, 408 F.3d at 791. Furthermore, the challenged events lasted, at most, seven months until Taylor formally reported them, as opposed to the two years during which Roebuck endured such harassment before it intensified and she formally complained.[2]
Although the lesser “off and on” incidents contribute to the atmospheric element of a hostile environment sex discrimination claim, see Nat’l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), a reasonable jury could find they were not yet so startling or foreboding that a reasonable person in Taylor’s position would have come forward earlier to prevent Bacon’s harassment from becoming as severe and pervasive as it became in April 2002. Her employer’s sexual harassment policy contemplated that employees would not file formal complaints until the harassment had become objectively severe, when the employee “reasonably perceived [such conduct] as creating a hostile or abusive work environment.” Policy Statement on the Prevention of Sexual Harassment, PBGC Notice No. 96-11 (emphasis added).[3] In doing so, the employer sought to curb “sexual harassment” in terms of “unwelcome sexual advances and requests for sexual favors” that have real work-related consequences, not casual, unwanted flirtation or trivial slights.
Reviewing Taylor’s proffered evidence, however, the court errs with respect to the legal standard for determining when, under Faragher and Greene, an employee must take advantage of her employer’s corrective procedures. Despite directly relevant precedent and the employer’s sexual harassment policy that defined sexual harassment in objective terms, the court *1307 holds, as a matter of law, that Taylor should have reported Bacon’s harassment in “October or November of 2001” because “[a] reasonable employee who believes and tells others she is being sexually harassed would report it.” Op. at 1318. This holding abandons binding precedent by converting what was heretofore a legally objective inquiry into when an employee should have reported harassment, Greene, 164 F.3d at 675, into one that is now subjective. The court accomplishes this conversion by sleight of hand, recasting Greene’s objective standard in terms of the employee’s subjective belief. Yet the purpose of an objective standard is to provide a frame of reference that excludes an individual’s subjective belief. Otherwise, an objective test would be meaningless and, in this type of case, would have the unintended consequence of placing a more stringent reporting requirement on a more sensitive plaintiff, who may believe she is being sexually harassed when, in fact, a reasonable person would disagree.
Under the correct legal standard— whether an employee who reasonably believes she is being sexually harassed would report it or was unreasonable in not reporting it — it is for a jury to decide whether Taylor should reasonably have believed she was being sexually harassed in a manner that required reporting. On this record, a reasonable jury could find that the fall 2001 incidents were not so startling or foreboding a reasonable person would have reported them to prevent escalation and/or that the employer’s objective sexual harassment policy did not cover Bacon’s pre-April 2002 conduct, which became reportable only when it escalated from “off and on” comments to physically aggressive advances. In either instance, Taylor’s decision not to report earlier would be reasonable. The affidavit of supervisor David Smith supports both of these inferences, stating that Taylor became more and more upset with Bacon’s behavior, that Smith “guess[ed]” Bacon’s behavior began around September or the fall of 2001, and that “[i]t was a gradual thing.... [I]t gradually over the months, it got to be pretty severe.” Smith Aff. 6-7 (emphasis added). The court’s response, that Taylor believed she was being harassed in “October or November 2001” because she “posted the [employer’s] sexual harassment policy on her office door and told her friend Smith that Bacon had been sexually harassing her,” Op. at 1319, is a red herring, ignoring both the objective tests articulated in Faragher and Greene as well as the employer’s objective sexual harassment policy, and misdirecting the relevant inquiry.[4] Whether Taylor herself believed she *1308 was being sexually harassed is irrelevant under all applicable standards.
As further evidence on which a jury could base a finding that Taylor did not unreasonably delay in reporting Bacon’s conduct, Taylor proffered evidence that Bacon at least twice threatened retaliation if she complained about him. In addition to the copy room incident, Bacon had previously told Taylor that if she “said something, they would think that [she was] the problem, not him.” In Roebuck, the court held “whether fear [of retaliation] and uncertainty [about the scope of the employer’s policy] made Roebuck’s delay in complaining reasonable was for the jury to decide.” Roebuck, 408 F.3d at 795. Here too there is a material issue of fact for the jury to resolve. To avoid this conclusion the court instead evaluates Taylor’s evidence to find that Bacon had “no leverage at all with which to intimidate Taylor” because he was not her supervisor. Op. at 1319. But Taylor proffered undisputed evidence that Bacon had told her he could get her an outstanding performance evaluation because he, her immediate supervisor (Henkel), and their supervisor (Joy) would as a group discuss what ratings to give subordinates, and that Bacon took credit when she received her outstanding evaluation. Further, it was undisputed that Bacon and Henkel socialized together and were “golfing buddies” who played golf approximately ten times a year. A reasonable jury could find that, faced with such management solidarity, any perceived delay in reporting Bacon’s conduct was reasonable.
The cases on which the court relies do not dictate a contrary conclusion. For instance, although the Fourth Circuit in Barrett v. Applied Radiant Energy Corp., 240 F.3d 262 (4th Cir.2001), rejected the “argument that reporting sexual harassment is rendered futile merely because members of the management team happen to be friends,” id. at 268, the court overlooks both the different evidence Taylor offered regarding Bacon’s ability to get her an outstanding evaluation and the difference that the Fourth Circuit drew between fear of futility and fear of retaliation. That court’s statement referred to futility and responded to employee Barrett’s contention that she failed to report her supervisor’s behavior because he was friends with management and she “did not think it would do any good.” Id. In this respect, “the only cost” to Barrett would have been failure to prevail upon filing a complaint, as she had no objective reason to fear retaliation. See Reed v. MBNA Mktg. Sys., 333 F.3d 27, 36 (1st Cir.2003). Yet the Fourth Circuit made no similar statement regarding fear of retaliation, stating only that “generalized” and “nebulous” fear of retaliation would not suffice to explain a delay in reporting. Barrett, 240 F.3d at 267. Here, by contrast, Taylor presented evidence from which a reasonable jury could find that she had a specific, “credible,” Reed, 333 F.3d at 36, reason to fear retaliation that was not merely “generalized,” Barrett, 240 F.3d at 267, “nebulous,” id., or “subjective,” Walton v. Johnson & Johnson Servs., 347 F.3d 1272, 1290 (11th Cir.2003). “[F]ailure” was therefore not “ ‘the only cost’ to Taylor of reporting Bacon in the fall of 2001,” Op. at 1319 (quoting Reed, 333 F.3d at 36), and a jury could find that any reasonable delay was justified under the circumstances. With favorable inferences, Taylor’s fear was no less substantiated than Roebuck’s, whose supervisor commented only once, vaguely, that he did not want to “find out [she] was taking sides with Lieutenant Clark,” who had witnessed him trying to kiss Roebuck. Roebuck, 408 F.3d at 792. Indeed, Taylor’s proffered evidence of retaliatory *1309 threats and conduct is stronger than was Roebuck’s.
III.
Retaliation. The evidence Taylor proffered to show retaliation illustrates why an employee would hesitate before filing a complaint pursuant to an employer’s sexual harassment policy. A complaint leads to an investigation that alerts the accused and other employees, including, as occurred here, the complaining employee’s immediate supervisor (Henkel) and his superiors (Joy and Hagans), that the employee has filed a complaint against another supervisor (Bacon). That process may itself cause negative consequences for an employee regardless of the outcome of the employer’s remedial process. Nonetheless, the high bar set for discrimination claims is no less high for claims of retaliation, see Brown v. Brody, 199 F.3d 446, 457 (D.C.Cir.1999), and an employee may recover damages only for those instances of retaliation that resulted in a “materially adverse” action. Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 57, 68-69, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).
As with Taylor’s sexual harassment claim, the court improperly, and with great consequence, denies Taylor the benefit of reasonable and favorable inferences from the evidence. E.g. Op. at 1322 (concluding an inference of retaliatory motive would be “untenable on the record here” where based on “ ‘mere proximity’ ” between the time she filed suit and the AWOL listing). It also disaggregates her evidence, Op. at 1321, when the legal standard requires it to be viewed in the aggregate. Although correctly concluding that the withholding of pay due pursuant to the “AWOL” incident was a materially adverse action, Op. at 1321, the court weighs and evaluates conflicting evidence in holding that Taylor failed to rebut her supervisor’s non-discriminatory reason for placing her on AWOL status, Op. at 1322. Dissecting the portrait of her work experiences after she formally complained, Op. at 1321-23, and failing to view the evidence in the aggregate, the court concludes that “Taylor herself had created” “the confusion” with regards to this incident. Viewed under the correct legal standard, however, Taylor has raised a material issue of disputed fact on which a reasonable jury could find in her favor.
Taylor’s retaliation claim is governed by the three-step framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, Taylor proffered evidence establishing a prima facie case of unlawful retaliation. After engaging in statutorily protected activity when she reported Bacon, her supervisor (Henkel) claimed she was AWOL even though she had followed the usual procedures for requesting leave, and denied her a week of earned pay, withholding it for an unknown period of time. As the court holds, that withholding was a materially adverse action. Op. at 1322. Howeyer, the court’s subsequent analysis fails both to acknowledge the aggregate effect of Taylor’s evidence of a causal connection between the protected activity and the adverse action and to accord her favorable inferences.
In Greer v. Paulson, 505 F.3d 1306 (D.C.Cir.2007), this court held, “After the employer offers a non-[retaliatory] justification for its actions, the McDonnell Douglas [ ] framework falls away, and [the court] must determine whether a reasonable jury ... could infer [retaliation] from the combination of (1) the plaintiffs prima facie case; (2) any evidence the plaintiff presents to attack the employer’s proffered explanation for its actions; and (3) any further evidence of [retaliation] that may be available to the plaintiff,” id. at 1318 (third alteration and ellipsis in original; internal quotation marks omit *1310 ted)(quoting Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1289 (D.C.Cir.1998) (en banc)); see Singletary v. Dist. of Columbia, 351 F.3d 519, 524 (D.C.Cir.2003) (applying McDonnell Douglas to a retaliation claim). Greer makes clear that all instances of retaliation, whether or not they are individually actionable under Burlington Northern, are relevant to this determination because they shed light on whether actionable conduct was retaliatory in nature. As the First Circuit has pointed out, “the critical inquiry becomes whether the aggregate evidence of pretext and retaliatory animus suffices to make out a jury question.” Mesnick v. Gen. Elec. Co., 950 F.2d 816, 827 (1st Cir.1991) (emphasis added).
Taylor’s proffered evidence pointed to a series of actions that adversely affected her ability to do her job. For example, there was evidence that as a result of her formal complaint, her immediate supervisor (Henkel) held up her work, delaying its submission to the Office of General Counsel, and assigned her low priority cases, all resulting in a lower level of productivity for the twelve-month period than in previous years. Where performance evaluations are directly correlated to productivity, as was true in Taylor’s employment situation, these actions necessarily resulted in steadily declining evaluations, from “outstanding” to “excellent” in 2002, and from “excellent” to “fully effective” in 2003. Taylor expressed fear that if they continued to decline she might receive an “unacceptable,” which is grounds for dismissal. As further examples, there was evidence that her second level supervisor (Joy) with whom she rarely spoke, had recommended she not be hired by another supervisor because he did not trust Taylor, that he'had advised Bacon not to go by her office “because she could take this, you know, as a way to tell another lie,” Bacon Depo. at 102, and that her third-level supervisor (Hagans) warned her about her “negative behaviors.”
When viewed in context with other proffered instances of management retaliation, and contrary to the court’s impermissible weighing and disaggregation of the evidence against Taylor, a reasonable jury could disbelieve her supervisor’s claimed reason for placing her on AWOL status and instead credit Taylor’s account of what transpired. See Aka, 156 F.3d at 1290 (quoting St. Mary’s Honor Center v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). According to Taylor, she requested leave in person and Henkel approved it informally, a practice that he admits is standard, acknowledging that in the past he signed her leave slips even after her leave had begun. Henkel thus knew exactly what type of leave she was requesting and which dates she would be out of the office. Nonetheless, seeing an opportunity to make her life more difficult in view of her complaint against his supervisor-friend and golfing buddy, when he noticed she checked the box for sick leave but placed the dates she would be out on a line above (next to annual leave), he claimed “confusion” and reported her to Human Resources, which, as an experienced supervisor, he knew would instruct him to designate her AWOL. There was no evidence that Human Resources would have so instructed had he not referred her request or had he advised, based on the conversation Taylor avers she had with him, what type of leave she wanted. There is no evidence, in fact, that Human Resources routinely reviewed these request forms when they were approved by the employee’s supervisor.
The court would instead improperly credit her employer’s account of the events, stating that Henkel, “confused” by Taylor’s “err[or] in completing the request form by ‘mistakenly checking] the sick *1311 leave box’ but entering the dates in the area for annual leave,” Op. at 1322 & n.* (second alteration in original) (quoting Taylor’s Opp. to Mot. Summ. J. at 37), requested guidance from Human Resources.[5] The court relies on her supervisor’s incomprehensible affidavit testimony: “Well, there was some confusion as to whether it was sick leave or annual leave. When I talked to personnel basically they said if it was sick leave cause [sic] she put the sign at the time for leave in the annual spot, but she checked off the sick leave portion of it, so I didn’t know if she was on sick leave or annual leave.” Henkel Aff. 9. This hardly establishes undisputedly that Taylor was the cause of any “confusion.” Admitting in the same affidavit that during the years he had been her supervisor there had never been a problem with Taylor’s leave, Henkel claimed “personnel” directed she be placed on AWOL because she had not received his prior approval. Id. at 10. This is not the same explanation for disapproval as the “confusion” he identified earlier. Moreover, the leave request slip, on which the court also relies, belies the “confusion” explanation.[6] On that request Henkel wrote in longhand that he “did not receive [the leave request] until Friday afternoon 10/31” and that “I’m assuming prior arrangements were made for this leave but no arrangements were made with me.” This explanation makes no reference to “confusion” about the type of leave requested. Moreover, Taylor averred that she had requested leave in person and cleared her leave with Henkel informally, a practice that he admits is standard and which in this instance would undermine any “confusion” claim about what type of leave she sought.
Given Taylor’s evidence, Henkel’s affidavit, and the leave request form showing what appear to be Henkel’s handwritten alterations to a previously signed and approved document, a material issue of disputed fact remains as to whether Henkel approved her leave as she claimed on October 31 or disapproved it on November 4 because of “confusion.” Although his apparent change of position may, as the court suggests, be “consistent with the [employer]^ explanation that Henkel [was confused],” Op. at 1322 n.*, the employer’s explanation must be more than “consistent” to prevail on summary judgment; it must exist to the exclusion of another also consistent explanation that favors the non-moving party in order to demonstrate entitlement to a judgment as a matter of law. Fed.R.Civ.P. 56(c); see Anderson, 477 U.S. at 247, 106 S.Ct. 2505. Here, that other explanation is that Henkel conjured up a “confusion” rationale, an account supported by, for example, the inconsistency between his affidavit testimony that he did not find out about Taylor’s leave until he came back to work in November 2003 and *1312 the leave slip itself, on which he acknowledged receiving it on October 31, 2003, and which he appears to have signed and dated the same day. See supra n. 6; Aka, 156 F.3d at 1290.
Reaching the opposite conclusion by crediting the employer’s “confusion” explanation, the court compounds its error by improperly disaggregating Taylor’s evidence and disregarding all proffered instances of retaliation that it concludes were not materially adverse. In doing so, the court fundamentally misconceives the relevance of this evidence. Even assuming these events are not themselves legally viable adverse actions, they are nonetheless evidence that the withholding of pay, an undisputedly viable adverse action, was retaliatory, and the court offers no good explanation for its disregard of those acts when it concludes otherwise. Nor can it. Just as Taylor’s counsel offered “revenge is a dish best served cold,” Oral Arg. at 32:04, retaliation can involve “a thousand cuts,” Patterson v. Whitman, No. 02-2213, 2003 U.S. Dist. LEXIS 26726, at *8 (D.D.C. June 9, 2003). Where one of those cuts was a materially adverse action, it blinks reality to suggest the other 999 shed no light on whether that cut was intentional and retaliatory.
The court objects that it cannot “merely assume! ] allegedly retaliatory acts were in fact retaliatory.” Op. at 1323 n.*. At summary judgment, however, that is exactly what the court must do. Taylor proffered evidence of a pattern of managerial retaliation, and properly viewed, her evidence is not so untenable as to merit dismissal at this stage of the proceedings. Verbal reprimands for “negative behaviors,” telling other supervisors that an employee cannot be trusted and tells “lie[s],” and slowed work processing that inevitably results in steadily declining performance evaluations that — -if continued — could result in dismissal are not “trivial actions,” id., even assuming they do not constitute actionable retaliation, but see Russell v. Principi, 257 F.3d 815, 818, 819 (D.C.Cir.2001); Weber v. Battista, 494 F.3d 179, 185 (D.C.Cir.2007). On this record, a reasonable jury could find that her supervisor’s reporting her to Human Resources, when in similar circumstances in the past he had not, was one of a series of retaliatory acts that resulted in the denial of a week’s pay for an unknown amount of time. The merits of this question are for the jury to decide, not this court.
In summary, circuit courts of appeal have acknowledged the difficult position that employees face as a result of the Supreme Court’s efforts in Faragher and Ellerth to limit vicarious liability for workplace sexual harassment. See Reed, 333 F.3d at 35; Walton, 347 F.3d at 1290; Barrett, 240 F.3d at 268. The dilemma for the victim is real: reporting casual flirtation too early likely results in exoneration for the harasser and workplace condemnation of the victim; reporting too late may bar relief altogether, even though the conduct has become progressively more severe. Navigating this tricky terrain, in Roebuck this court acknowledged on facts similar to Taylor’s that a jury could have found the plaintiff was reasonable in not immediately reporting unwanted advances. See also Greene, 164 F.3d at 674-75. Because this court must accord Taylor as the nonmoving party all favorable inferences from the evidence, a reasonable jury could find she did not unreasonably delay in reporting harassment under her employer’s policy establishing an objective standard for reporting. It is no response to ignore, as the court does, the required standard of review and binding precedent on the substantive legal standards to be applied. The standard for reporting is an objective one, not the subjective one the court fashions today. A reasonable jury, *1313 viewing her proffered evidence in the aggregate, as the correct legal standard requires, also could find that her supervisor unlawfully retaliated against her for filing a formal complaint. The court can reach the opposite conclusion only by discarding that standard of review when it disaggregates and thereby discounts favorable evidence, denies Taylor the benefit of favorable inferences, and ignores the real world retaliatory consequences of the employer’s actions. Whether a reasonable jury would find in Taylor’s favor or conclude she is not credible is not the question before this court, only whether she can survive summary judgment. Essentially, the court overlooks that “all that is required [from the nonmoving party to defeat summary judgment] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties’ differing versions of the truth at trial.” First Nat’l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). Accordingly, on this record I would reverse the grant of summary judgment and remand the case to the district court.

. In Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Supreme Court held that employers have an affirmative defense against actionable hostile environment claims when no tangible employment action is taken against the employee-plaintiff. The defense has two necessary elements: (1) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior,” and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.” Faragher, 524 U.S. at 807, 118 S.Ct. 2275; see Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

. The court makes no attempt to explain how Bacon's conduct prior to April 2002 differs from the "off and on” harassment that Roebuck endured before Corbett’s harassment escalated and she filed a formal complaint. Although it attempts to distinguish Roebuck on the ground that “the question [there] was whether 'fear and uncertainty made [the employee’s] delay in complaining reasonable,' ” Op. at 1319-20 n.® (quoting Roebuck, 408 F.3d at 795) (second alteration in original), Roebuck’s supervisor threatened retaliation less than a month before she complained in January 1998, and her uncertainty about whether the employer's sexual harassment policy applied to conduct outside of the workplace extended at most to October of the previous year. Yet her supervisor had been harassing her "off and on” for nearly two years prior; "fear and uncertainty” thus came into play only after a long period of ongoing harassment. The court offers no reason why Roebuck’s two-year delay in reporting any of this "off and on” harassment was excusable, see Roebuck, 408 F.3d at 796, while Taylor’s at most seven month delay is not.

. The Policy Statement defined "sexual harassment” as:
[v]erbal or physical conduct of a sexual nature, including unwelcome sexual advances and requests for sexual favors ... when:
a. submission to such conduct is made explicitly either a term or condition of an individual’s employment;
b. submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or
c. such conduct is reasonably perceived as creating a hostile or abusive work environment.
Policy Statement on the Prevention of Sexual Harassment, PBGC Notice No. 96-11 (emphasis added).

. The court misreads Taylor’s EEO complaint, Op. at 7, 10 n.*, which does not state that she posted the sexual harassment policy on her door in response to Bacon’s conduct towards her, but rather — and only — that she posted it in response to "several incidents with the PPD management staff that I think are incidents of harassment so that was my subtle way to say look at this, stop, you are behaving in this manner, be careful.” EEO Compl. Att. 8. Taylor makes no mention here whether these "incidents” related to her specifically; at the summary judgment stage, the court must view the facts in the light most favorable to her and conclude they did not.
Moreover, the court fails to acknowledge what the court in Roebuck presumed, namely the wide gulf between a layperson’s use of the word "harassment” to try to prevent inquiry into her personal affairs, and a court’s use of the same word as a term of art to express a legal conclusion under Faragher and Meritor. For instance, a male boss who calls a female employee "honey” or "sweetie” may provoke a response to stop "sexually harassing me” or a complaint to a friend that she is being "sexually harassed,” but she would be wrong as a legal matter if she thought such conduct, without more, was actionable or that the incident merited reporting under the policy of Taylor’s employer. So too with Taylor’s statements to Bacon in response to him telling her he "bet [he] could beat [her boyfriend]” or to *1308 Smith when she complained about Bacon's behavior.

. To the extent the court interprets this statement, which appeared only as a parenthetical in Taylor’s opposition to the motion for summary judgment, as an acknowledgment of her error in completing the form, the court ignores the more obvious contextual interpretation that Taylor was recounting Henkel’s claimed basis for "confusion,” not confessing error. Again, the court views the record in the light least favorable to Taylor.

. Taylor’s leave request form has a typed "X” only in the box marked "Accrued Sick Leave,” which appears in a column listing various types of leave, and a typed listing of the dates on the first line to show when she would be out and the number of work hours she would miss. Beside her signature in the "CERTIFICATION” box is typed "10/31/03” for the date of the request. By contrast, on the signature line for "OFFICIAL ACTION ON REQUEST,” the "X” next to "APPROVED” is scratched out and an "X” appears next to "DISAPPROVED”. On the signature line, following Henkel's signature is (he handwritten date "11/04/03,” which is written over the handwritten date, "10/31/03,” effectively crossing out that date.