David ROSADO, Plaintiff,

v.

**AMERICAN AIRLINES, Defendant.**

**Civil No. 09–1418 (FAB).**

United States District Court,
D. Puerto Rico.

Oct. 14, 2010.

Jorge R. Roig–Colon, Gonzalez & Roig, Kendys Pimentel–Soto, San Juan, PR, for Plaintiff.

Juan F. Santos–Caraballo, Schuster & Aguilo LLP, James D. Noel III, McConnell Valdes, Maralyssa Alvarez–Sanchez, San Juan, PR, Phv Grace M. Mora, Phv Juan C. Enjamio, Hunton & Williams LLP, Miami, FL, for Defendant.

## OPINION AND ORDER

BESOSA, District Judge.

October 9, 2009, plaintiff David Rosado ("Rosado") filed an amended complaint against defendant American Airlines ("American"), alleging violations of: (1) the Americans with Disabilities Act ("ADA") and its local counterpart, Puerto Rico Law 44; (2) local statutes prohibiting gender-based discrimination and harassment in the workplace, Puerto Rico Laws 100 and 17, respectively; (3) the local prohibition on wrongful discharge, Puerto Rico Law 80; and (4) the Puerto Rico Civil Code for breach of confidentiality. (Docket No. 53 at 1–2.) On June 25, 2010, American

moved for summary judgment. (Docket No. 62.) Rosado opposed the motion for summary judgment on August 3, 2010, (Docket No. 69), and American replied to the opposition on August 20, 2010 (Docket No. 80). For the following reasons, the Court GRANTS American's motion for summary judgment.

## UNCONTESTED FACTS

Rosado began working for American Airlines on June 12, 1985, as a Fleet Service Clerk in the cargo department at the Luis Muñoz Marin Airport in San Juan, Puerto Rico. (Docket No. 64–2 at 2.) Rosado's supervisors testified that throughout his career, he was an excellent, intelligent employee. (Docket Nos. 74–12 at 3; 74–13 at 15; 74–14 at 10; 74–16 at 6.)

As of 2005, a Fleet Service Clerk's responsibilities included "handling of items on and off aircraft, carts, containers, and trucks; transporting items between terminals and aircraft; receiving, delivering, weighing and documenting of cargo in a cargo specific facility (warehouse) or a loading dock area." (Docket No. 64–2 at 8.) A Fleet Service Clerk's responsibilities may also include other, less physically demanding tasks, such as handling mail. (Docket No. 74–12 at 5–6.) A Clerk's responsibilities were assigned to him or her based on a bidding system that operated by way of seniority. *Id.*

According to Veraliz Mila ("Mila"), American Airlines's Human Resources Senior Specialist for Operation Support in San Juan and Miami, American is required by Federal law and by its own internal standards to operate with the highest degree of care for the safety of the traveling public. (Docket No. 64–2 at 3.) Mila stated that one way American ensures these standards is by maintaining and enforcing a drug and alcohol free workplace. *Id.*

## A. Rosado's Mental Illness and Cocaine Addiction History

According to files maintained by the Manager for American's Employee Assistance Program ("EAP"), Eleonora Campolieto ("Campolieto"), on October 15, 1996, Rosado was removed from service due to his cocaine addiction. (Docket No. 64–1 at 10–11.) He was voluntarily admitted to Mount Sinai Medical Center's Addiction Treatment Program in Miami, Florida, on October 23, 1996, and was discharged from the inpatient program on October 29, 1996. *Id.* With the assistance of the EAP, Rosado then enrolled in an outpatient treatment program at Integrated Healthcare Systems in San Juan, Puerto Rico, where he continued to receive treatment on an outpatient basis. *Id.* at 13–15. He was released to return to work on November 21, 1996. *Id.* According to Campolieto, EAP assists employees to obtain treatment for drug and alcohol dependency and other personal problems that affect an employee's health and job performance. (Docket No. 64–1 at 6.) Maintaining the employee's confidentiality and anonymity is important to the program, so employees are comfortable requesting assistance without disclosing the nature of their problem to colleagues or supervisors. *Id.*

Rosado agreed to be placed on a drug recovery program through American's *Drug Recovery Monitoring IVRS System*; on November 26, 1996, he signed an agreement for aftercare treatment in order to ensure his continuing recovery. (Docket No. 64–1 at 17–18.) Pursuant to that agreement, Rosado agreed to maintain complete abstinence from alcohol and/or any drug, except as authorized by American's Medical Department. *Id.* He also voluntarily agreed to submit to random drug testing. *Id.* Rosado's agreement also included a provision stating that his failure to comply could result in his removal from

service without pay for medical reasons; he signed a waiver of his rights under applicable federal and/or state disability laws or regulations to challenge his medical removal from service for violation of the agreement. *Id.* On January 30, 1997, Rosado voluntarily informed American that he had suffered a relapse. *Id.* at 20. According to the EAP document regarding Rosado's relapse, Rosado was again placed into the outpatient program. *Id.* According to an EAP evaluation report, Rosado relapsed again in August of 1998 and requested EAP's assistance. *Id.* at 22.

On October 13, 1998, Rosado tested positive for cocaine during a random drug test. (Docket No. 64–2 at 3.) On November 11, 1998, American terminated Rosado's employment for violating Rule 33 of American's Rules of Conduct, which states, *inter alia*, that possessing or using a narcotic either on duty or off duty, except in accordance with medical authorization, is prohibited. *Id.*

On or about November 3, 1998, Rosado was admitted to First Hospital Panamericano in San Juan, Puerto Rico for cocaine and alcohol dependencies and depression. (Docket Nos. 64–7 at 10, 77–1.) On November 19, 1998, Rosado and American entered into an Agreement for Conditional Reinstatement ("Agreement") which stated the terms and conditions upon which Rosado's continued employment at American would be based. (Docket No. 64–3 at 10.) As part of the Agreement, Rosado agreed to submit to any procedure requested by management, including a breathalyzer or urinalysis test, deemed appropriate, which would have bearing on his compliance with the Agreement. *Id.* Additionally, Rosado signed an undated Letter of Resignation, which would be implemented by American if Rosado's breached the Agreement. *Id.*

At the end of 1998 and the beginning of 1999, Rosado divorced his wife and was diagnosed with HIV. (Docket No. 64–5.)

In early 2000, Rosado entered into a romantic relationship with Jorge Mendez–Torres ("Torres"). *Id.*

In December of 2007, Rosado again solicited assistance from American's EAP to help him overcome his recent cocaine binge. (Docket No. 64–1 at 25.) At American's request, Rosado checked himself into a drug treatment and recovery program at Conifer Park in New York City. (Docket Nos. 64–1 at 25; 64–7 at 1.) Rosado's medical records from Conifer Park state that he reported being "out of control", having "started to use on the job", and wanting "a clean and sober life." (Docket No. 64–7 at 1.) On March 25, 2008, Rosado returned to work. (Docket No. 64–1 at 27.) In April of 2008, EAP union representative Manny Diaz ("Diaz") contacted Campolieto to inform her that Rosado had relapsed in his drug use and had spent $500 on cocaine in the previous few days. *Id.* at 29. Campolieto advised Rosado he should call in sick the next day and consult with Vivian Rodriguez ("Rodriguez") regarding an aftercare follow up plan. *Id.* On June 26, 2008, Rosado signed another agreement for an aftercare treatment plan, which stated that he would agree to submit to any required medical tests and that he agreed to maintain complete abstinence from alcohol and drugs. *Id.* at 31. By signing the agreement, Rosado understood that his failure to comply with the agreement could result in removal from service without pay for medical reasons. *Id.*

In July of 2008, Rosado was tested by American's medical personnel to determine the effects of his medications on his cognitive functioning. (Docket No. 74–25.) The report submitted by the medical personnel indicated that Rosado "likely has the basic skills necessary to perform his job duty." *Id.*

## B. Rosado's Re–Testing Incident and Aftermath

On August 29, 2008, Rosado was selected for a random drug test; the results of which were returned "diluted". (Document Nos. 74–2 at 34; 74–3 at 46–47.) On September 17, 2008, EAP Manager Campolieto received notification that Rosado's last drug test results were diluted and he needed to be retested immediately. (Docket No. 64–6 at 18–19.) On the morning of Sept. 18, 2008, Campolieto informed Rosado of the diluted results of the previous test, and told him that he had to report for a drug test. (Docket No. 74–2 at 36–40.) Rosado had not been previously required to submit to a drug test within a time constraint shorter than his full shift of work. *Id.* at 34–36. When Rosado failed to appear for the test immediately, Campolieto called Rosado again and informed him that he had to report for the drug test within thirty minutes. *Id.* at 39–40. Rosado failed to appear for the drug test within the time allotted. *Id.* at 48; (Docket No. 64–6 at 13–16.) Rosado was then removed from service. (Docket No. 64–6 20–61, 45–49, 50.)

On September 18, 2008, Mildred Fuentes, ("Fuentes"), Cargo Manager at American, contacted Rosado, informing him that he was to report to a meeting on September 19,2008 to discuss the status of his suspension. (Docket Nos. 64–6 at 28; 74–3 at 5.) Rosado failed to attend this meeting, and called Fuentes later in the day to notify her that he was not feeling well. (Docket Nos. 64–6 at 30–32; 74–3 at 6.) Fuentes told Rosado to appear for a meeting on September 22, 2008. (Docket No. 74–3 at 6–7.) Fuentes also sent Rosado a letter directing him to appear for a meeting in her office at 11:00 a.m. on September 22, 2008, the failure of which would be considered insubordination. (Docket No. 64–3 at 15.) The letter further stated that Rosado was withheld from

service without pay beginning on September 19, 2008. *Id.* The parties do not dispute that on September 22, 2008, Rosado failed to attend the meeting. On the same day, Mila instructed Fuentes to date and sign Rosado's Letter of Resignation and send it via Federal Express to Rosado's home. (Docket. No. 64–3 at 18.)

On September 20, 2008, Rosado checked himself into Hermanos Melendez Hospital, and was transferred to the Panamericano Hospital on September 22, 2008. (Docket Nos. 74–3 at 7–8; 64–7 at 10.) Rosado's medical records from Panamericano Hospital show that he received "primary attention" at Hermanos Melendez Hospital "after a suicidal attempt intoxicating himself with medications and cocaine." (Docket No. 64–7 at 19–20.)

On September 30, 2008, Rosado learned that American had activated his Letter of Resignation. (Docket No. 74–3 at 10.) Rosado filed a grievance contesting his termination on October 9, 2008, which was denied by the hearing officer. (Docket No. 64–3 at 22.) Rosado then filed an appeal of his discharge, and an arbitration hearing was held on February 26, 2009, at which American's decision to activate Rosado's Letter of Resignation was upheld. (Docket No. 64–2 at 5.) On October 31, 2008, Rosado filed a charge with the Equal Employment Opportunity Commission ("EEOC"). (Docket No. 64–3 at 25.) On February 12, 2009, the EEOC issued a Notice of Right to Sue. *Id.* In November of 2008, Rosado applied for Social Security benefits for disability; his application was granted on July 29, 2009. (Docket Nos. 74–18, 64–5 at 92.)

## C. Rosado's Sexual Harassment Claims

American has a policy that explicitly prohibits unlawful harassment and provides mechanism for employees to report such harassment. (Docket No. 64–2 at 5–

6.) One of the ways that employees may report harassment is through an anonymous toll-free hotline, which has been maintained by American since 1997. *Id.* Information about American's policy against harassment and about the hotline is included in American's policies. *Id.* American provided Rosado with a copy of its Policy Statement Against Unlawful Harassment, which includes American's policies against unlawful harassment and the mechanisms available for reporting such harassment, including the use of the anonymous hotline, Rosado admits to having received and signed the policy statement in 1995. *Id.*; Docket No. 64, Appendix D at 177–78. Rosado never reported any alleged unlawful harassment he experienced through the anonymous hotline. (Docket No. 64–5 at 71.)

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. The Rule states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52. (1st Cir.2000). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion for summary judgment. For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *See Suarez v. Pueblo Int'l., Inc.,* 229 F.3d 49, 53 (1st Cir.2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine." Material means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is genuine when a reasonable jury could return a verdict for the nonmoving party based on the evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505. It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994).

In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

### II. Claims Under Americans With Disabilities Act and Law 44

The Americans with Disabilities Act ("ADA") prohibits discrimination against

an otherwise qualified individual based on his or her disability in all employment practices, including job application procedures, hiring, firing, advancement and compensation. 42 U.S.C. § 12112(a).

■ Puerto Rico's Law 44, modeled after the ADA and structured to harmonize Puerto Rico law with the ADA's statutory provisions, protects against discrimination by any public or private institution that receives funding from the Commonwealth of Puerto Rico against persons suffering from disabilities. *See Torres–Alman v. Verizon Wireless*, 522 F.Supp.2d 367, 401 (D.P.R.2007) (internal citation omitted). Law 44 states specifically that those institutions are prohibited from taking action to "discriminate against persons with some type of physical or mental disability." P.R. Laws Ann., tit. 1, § 504. The elements required to satisfy a claim pursuant to Law 44 mirror those required to satisfy a claim pursuant to the ADA. *See id.* Accordingly, the Court applies case law governing the application of ADA standards to the plaintiffs' claims under Law 44.

■ To succeed in a disability discrimination case under the ADA, a plaintiff must prove by a preponderance of the evidence: (1) that he is disabled within the meaning of the ADA; (2) that he is able to perform the essential functions of his job, with or without reasonable accommodation; and (3) that the adverse employment decision was based in whole or in part on his disability. *Phelps v. Optima Health Inc.*, 251 F.3d 21, 24 (1st Cir.2001); *Garcia–Ayala v. Lederle Parenterals Inc.*, 212 F.3d 638, 646 (1st Cir.2000).

American does not dispute that Rosado, who is suffering from bipolar disease and depression, HIV, and substance abuse with cocaine, is considered "disabled" under the definition of the ADA. *See* 42 U.S.C. § 12102. American argues, however, that Rosado has failed to establish a *prima facie* case of disability-based discrimination because (1) Rosado cannot show that he was a "qualified individual" with a disability, and (2) Rosado cannot show any causal relationship between his alleged disabilities and his termination.

### A. "Qualified Individual" Analysis
#### 1. General Standard

■ American argues that Rosado is not a qualified individual who can perform the essential functions of a Fleet Service Clerk because he posed a "direct threat" to the safety of himself and others that could not be eliminated by reasonable accommodation. *See* 42 U.S.C. §§ 12111, 12113. Rosado bears the burden of showing that he is a "qualified individual." *EEOC v. Amego, Inc.*, 110 F.3d 135, 142 (1st Cir.1997). The qualified individual analysis occurs in two steps: "(1) determining whether the plaintiff can perform the essential functions of his position; and (2) if he is unable to perform those essential functions, whether any reasonable accommodation would enable him to perform the essential functions." *See Phelps*, 251 F.3d at 25. The essential function of a job is a "fundamental job duty of the employment position." *See Ward v. Massachusetts Health Research Institute, Inc.*, 209 F.3d 29, 34 (1st Cir.2000). American posits that, as of 2005, the essential functions of a Fleet Service Clerk included being able to: manually handle items of a variety of shapes; lift seventy pounds; stand for extended periods of time; operate vehicles and navigate in areas congested with aircraft, vehicles and equipment; possess cognitive skills to process paperwork and perform simple mathematical functions; among other tasks. (Docket No. 64–2 at 9.) Rosado presented statements from his previous supervisors at American who indicated that he was an "excellent worker"; that his mental condition didn't affect any change in his performance; that on a scale of 1 to 10, his work performance was a

"ten"; and that he was "very intelligent towards his work". (Docket Nos. 74–12 at 3, 74–13 at 15, 74–14 at 10, 74–16 at 6.) Rosado also presented a statement by his psychiatrist, who stated that he believed Rosado was "able to carry out his [work] duties." (Docket No. 74–7 at 3.) Lastly, Rosado presented a medical examination report conducted by American, which determined that Rosado "likely had the basic skills necessary to perform his job", though he "may be at more risk for errors due to his attentional deficits." (Docket No. 74–25.)

### 2. Direct Threat Defense

American contends that Rosado cannot safely perform the essential functions of a Fleet Service Clerk in the cargo department (where Rosado was assigned) because he posed a direct safety threat to himself and others due to his chronic drug addiction. The First Circuit Court of Appeals has held that where the "essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that [he] can perform those functions in a way that does not endanger others." *Amego*, 110 F.3d at 144 (where plaintiff was not a "qualified individual" because her mental illness and history of prescription drug overdose affected her ability to perform the tasks of dispensing prescription medications and posed a risk "expressly associated with performance of an essential job function."). In cases where "the issue of direct threat is not tied to the issue of essential job functions but is purely a matter of defense", the defendant bears the burden. *Id.* In this case, the question of whether Rosado could perform the essential functions of a Fleet Service Clerk is separate from the question of whether he nonetheless posed a risk because of his chronic drug addiction. *See id.* at 143; *see also School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). Thus, the burden to prove that Rosado posed a direct threat to himself and others rests with American.

■ American alleges that given Rosado's history of cocaine addiction and use on the job, he could not safely perform the functions of a clerk in the cargo department and was a direct threat to himself, co-workers and American passengers. To determine whether an employee poses a direct threat under the ADA, a Court must determine not "whether a risk exists, but whether it is significant." *Bragdon v. Abbott*, 524 U.S. 624, 649, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). In *Amego*, the First Circuit Court of Appeals held that it was "eminently reasonable for Amego to be concerned about whether [plaintiff] could meet her responsibilities" where Amego's judgment "about the risks of future behavior by an employee [was] based on past behavior and reasonable indicia of future behavior." *Amego*, 110 F.3d at 145 (finding that plaintiff was not qualified for a position that required her to handle medications and posed a direct threat to herself and others where: (1) the nature of the risk involved harm to vulnerable clients; (2) employer had received complaints about plaintiff's performance on the job and risk to patients; (3) plaintiff had previous behavior of attempting suicide through overdosing on medications that would be available to her at her job; and (4) plaintiff's health care providers did not provide reassurance about plaintiff's ability to perform on the job); *see also Calef v. Gillette Company*, 322 F.3d 75, 87 (1st Cir.2003) (stating that "the ADA does not require that an employee whose unacceptable behavior threatens the safety of others be retained, even if the behavior stems from a mental disability.")

■ In its motion for summary judgment, American provides evidence of Rosado's undisputed history with substance

abuse, but does not present any evidence of how his struggle with mental illness and substance abuse made him unable to perform the essential functions of his job. To the contrary, American did not deny that "Rosado worked at American for 23 years, with an excellent record as to safety in the workplace." (Docket Nos. 69–1, 80.) At this stage of the proceedings, American has provided insufficient evidence to show that Rosado posed a "direct threat" to himself and others in the workplace. Thus, Rosado will be considered a "qualified individual" for the purposes of his claim under the ADA.

### B. Causal Relationship between Disability and Termination

■ American argues that Rosado cannot show that he was terminated because of his disabilities. To prove the motive for the adverse employment decision, a plaintiff can rely on direct evidence of discrimination, or proceed under the *McDonnell Douglas* burden shifting regime. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252 (1st Cir.1999). Rosado has provided no direct evidence that the individuals who made the decision regarding his termination knew about his disabilities and discriminated against him on that basis. *See Patten v. Wal–Mart Stores East, Inc.*, 300 F.3d 21, 25 (1st Cir.2002) (direct evidence "consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision" (internal citations omitted)); *see also Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 580–81 (1st Cir.1999). Thus, the Court proceeds in analyzing this prong of the ADA test under the *McDonnell Douglas* regime. Under the *McDonnell Douglas* framework:

[A] plaintiff who suffers from a disability makes out a prima facie case of employment discrimination by demonstrating that [he] is a member of a protected group who has been denied an employment opportunity for which [he] was otherwise qualified. Such a showing gives rise to an inference that the employer discriminated due to the plaintiff's disability and places upon the employer the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment decision. This entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the plaintiff's at all times. Once such a reason emerges, the inference raised by the prima facie case dissolves and the plaintiff is required to show ... that the employer's proffered reason is a pretext for discrimination.

*Marcano–Rivera v. Pueblo Intern., Inc.*, 232 F.3d 245, 251 (1st Cir.2000) (*citing Dichner v. Liberty Travel*, 141 F.3d 24, 29–30 (1st Cir.1998)).

### 1. American's Legitimate Nondiscriminatory Business Reason

■ Because Rosado has demonstrated that he is disabled and "qualified" under the meaning of the ADA, the burden shifts to American to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Corujo–Marti v. Triple–S, Inc.*, 519 F.Supp.2d 201, 212 (D.P.R. 2007). Under the *McDonnell Douglas* framework, in order to rebut the presumption that arises upon plaintiff's establishment of a *prima facie* case, "the employer need only produce enough competent evidence which, if taken as true, would permit a rational factfinder to conclude that the challenged employment action was taken for a 'legitimate, nondiscriminatory reason ...'" *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 166 (1st Cir.1998). American contends that Rosado's history

of cocaine abuse, previous positive test for cocaine use, previous removal from service due to his substance abuse, combined with the fact that Rosado's last drug test results were "diluted" and that he failed to report for a retest immediately, constituted a legitimate business reason to activate Rosado's Letter of Resignation and end his employment with American.

Rosado was terminated from American's employment for the first time in 1998 due to a positive test result for cocaine. Shortly after his termination, Rosado and American entered into an Agreement for Conditional Reinstatement, which stipulated, among other things, that if Rosado failed to submit to a drug test, American had the option of effecting the undated Letter of Resignation that Rosado signed as part of his agreement to return to work for American.

In August of 2008, Rosado submitted to a random drug test, the results of which were returned "diluted" and required Rosado to be re-tested. On September 18, 2008, Campolieto informed Rosado of his test results and told him that he needed to report for a re-test. The specific events surrounding Rosado's failure to appear for the test within the allotted time are in dispute, but are not relevant for our purposes.

The facts that both parties agree to are as follows: Campolieto called Rosado on the morning of September 18, 2008, informing him that he needed to be re-tested within 30 minutes. (Docket No. 74–2 at 39–40.) Rosado does not dispute that Campolieto asked Rosado if he wanted her to talk to his crew chief or supervisor so that he could be tested immediately, and Rosado told her there was no need. Because 30 minutes had elapsed, Campolieto called Rosado to tell him that he had been suspended from service. Rosado was instructed to report for a meeting with his supervisor the following morning, on Sep-

tember 19, 2008, which Rosado did not attend. Rosado was then directed to report for a rescheduled meeting on September 22, 2008, to which he did not show up because he was in the hospital. Rosado's Letter of Resignation was dated and signed on September 22, 2008 by Rosado's supervisor, and sent to his home. Rosado learned of his termination on September 30, 2008.

■ American contends that because Rosado did not report immediately for his drug re-test and failed to appear at meetings with his supervisors to discuss his suspension, he had effectively breached his Agreement for Conditional Reinstatement and American was therefore entitled to effect his Letter of Resignation. American has met its burden of offering a legitimate business reason for terminating Rosado based on his lack of compliance with the re-testing procedures and his failure to follow instructions to meet with supervisors to discuss his suspension which resulted in a breach of the Agreement for Conditional Reinstatement. *See Hodgens,* 144 F.3d at 166–7 (finding that employer met its burden of producing enough evidence that would permit a rational factfinder to conclude that a challenged employment action was taken for a legitimate, nondiscriminatory reason where the employer "offered testimony of its decision-making supervisors that [the employer] discharged [the employee] because of his performance and his non-FMLA absences . . .").

### 2. Pretext for American's Business Reason and Evidence of Discriminatory Animus

■ The Court now reviews whether Rosado has presented any direct or circumstantial evidence to lead a reasonable factfinder to conclude that American's business reason was mere pretext, *and* that American was in fact motivated by

discriminatory animus. *Webber v. Int'l. Paper Co.*, 417 F.3d 229, 235–6 (1st Cir. 2005).[1] One way that a plaintiff can establish that American's stated reasons for his termination are a pretext for discrimination is "to show that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker." *See Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (articulating ways of showing pretext in a Title VII discrimination case); *see also Julia v. Janssen, Inc.*, 92 F.Supp.2d 25, 38 (D.P.R.2000) (affirming that one way to show pretext and discriminatory animus in a claim for wrongful termination under the ADA is to show "comments by decisionmakers which denigrate [persons in the protected group]") (citing *Mesnick v. General Elec. Co.*, 950 F.2d 816, 824 (1st Cir.1991)). We review the record to determine whether Rosado "has produced sufficient evidence for a rational jury to conclude that [American's] reasons were a pretext for discrimination." *Hodgens*, 144 F.3d at 169 (1st Cir.1998).

██ Rosado alleges, contrary to American's assertions, that a number of individuals were involved in the decision to terminate his employment, including: Campolieto, Mila, Valiente, Fuentes, Rosalyn Beaty ("Beaty") (a physician for American's Occupational Health Services program), John Tuttle ("Tuttle") (Lead EAP Manager), and Shannon Lalley ("Lalley") (American's Manager of Drug and Alcohol Administration). Rosado claims that all of these individuals had actual or constructive knowledge of his disability, because a record of his HIV positive status and his mental illness was included in his employment files. Ameri-

can does not dispute that Tuttle communicated to Beaty and Campolieto that Rosado had violated his Conditional Reinstatement Agreement by failing to appear for his retest. (Docket No. 74–9.) American also does not dispute that Lalley sent Valiente an e-mail informing her that Rosado was in the EAP program and had failed to report for a retest, thus constituting a refusal to test. *Id.* American offers deposition testimony from Campolieto affirming that she did not participate in any way in the decision to terminate Rosado. (Docket No. 81–1 at 29.) American offers sworn declaration testimony from Lalley, Valiente and Mila stating that they had no knowledge of Rosado's HIV positive status or mental condition at any time. (Docket Nos. 81–1 at 32; 64–2 at 5; 64–4 at 3.) American offers deposition testimony of Fuentes, who affirmed that she did not participate in the decision to activate Rosado's resignation letter, but that she was asked to sign and date the letter upon instructions from Mila and Valiente. (Docket No. 64–6 at 34–5.)

██ Rosado also alleges that certain of his supervisors, such as Matienzo, Hiram 'Papo' Delgado ("Delgado"), and Camilio Sanchez ("Sanchez") discriminated against Rosado by making disparaging comments to him and refusing to touch him or share food with him after they became aware of his HIV positive status. Rosado presents no evidence, however, that any of these individuals were involved in the decision to terminate Rosado. *See Marcano–Rivera v. Pueblo Int'l., Inc.*, 232 F.3d 245, 253 (1st Cir.2000) (rejecting employee's claim of pretext for discrimination under the ADA where employee pointed to comments al-

---

1. "While a satisfactory evidentiary explanation by the employer for its actions destroys the legally mandatory inference of discrimination arising from the employee's *prima facie* case, the evidence and inferences that proper-

ly can be drawn from the evidence presented during the employee's *prima facie* case may be considered in determining whether the employer's explanation is pretextual." *Hodgens*, 144 F.3d at 161.

legedly made by her immediate supervisor and "her supervisor was not a decision-maker relevant to her dismissal ..."); *cf. Rodriguez–Torres v. Caribbean Forms Manufacturer, Inc.*, 399 F.3d 52, 60 (1st Cir.2005) (noting that where discriminatory comments are made by the "relevant decision-maker", the jury was entitled to disbelieve the employer's articulated reason for employee's termination.) Although "evidence of a company's general atmosphere of discrimination 'may be considered *along with any other evidence bearing on motive* in deciding whether ... plaintiff has met [his] burden of showing that the defendants' reasons are pretexts", the general rule is that "statements made by 'one who neither makes nor influences [a] challenged personnel decision are not probative in an employment discrimination case.'" *Santiago–Ramos*, 217 F.3d at 55–56 (internal citations omitted). Thus, this Court finds that because the record is devoid of any evidence that anyone in a decision-making role bore any discriminatory animus toward Rosado, Rosado has failed to establish that American's legitimate business reason for terminating him was mere pretext.

Furthermore, Rosado's attempt to demonstrate discriminatory animus on the part of American is undercut by the undisputed evidence that American granted numerous accommodations to Rosado to help him deal with his disabilities. Like the employer in *Amego*, American "had earlier made accommodations" for Rosado by allowing him to take extended periods of leave to obtain substance abuse treatment and deal with his HIV diagnosis, providing him with counseling and therapy resources, reinstating his employment after he tested positive for cocaine, and being "supportive of [his] efforts to deal with [his] condition." [2] *Amego*, 110 F.3d at 146 (citing *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 17 (1st Cir.1997) (stating that in a claim for retaliation under the ADA, "[e]vidence that an employer willingly granted an employee's request for an accommodation, though by no means dispositive of the matter, tends to militate against making an inference of retaliation ...")). This Court finds that no reasonable factfinder could rationally infer from the record that there exists a genuine issue of material fact regarding the authenticity of American's business reason for terminating Rosado. American's Motion for Summary Judgment as to Rosado's claims under the ADA and Law 44 is **GRANTED.**

### III. Claims Under Law 100 and Law 17

Rosado alleges that he was discriminated against on the basis of his gender and was subject to sexual harassment in the workplace. Specifically, Rosado argues that he was subject to gender stereotyping and was unjustly terminated in violation of Law 100 (P.R. Laws Ann. tit. 29 § 146). He then argues that he was subjected to a "hostile work environment" based on his gender which also constituted sexual harassment in violation of Laws 100

---

**2.** Rosado was offered and granted FMLA leave to treat his HIV condition when he was diagnosed. (Docket No. 74–13 at 13–14.) In December of 2007, Rosado solicited help from American's EAP to overcome his most recent cocaine binge. (Docket No. 64–1 at 25.) He checked himself into a drug treatment and recovery program in New York City, where his medical records indicate that he had "started to use on the job" but he wanted "a clean and sober life." (Docket No. 64–7 at 1–9.) Rosado returned to work in March of 2008, but relapsed again in April of 2008. (Docket No. 64–1 at 27.) He contacted Campolieto at this time, seeking assistance, who told Rosado to call in sick the next day so that he could "protect his job" in the event that he was asked to submit to a random drug test. *Id.* In June of 2008, Rosado signed another agreement that required Rosado to submit to any medical tests and stated that his failure to comply with the agreement could result in his removal from service without pay. *Id.*

and 17 (P.R. Laws Ann. tit. 29 §§ 146 and 155). The Court will address each of these claims separately.

## A. Gender Stereotyping and Unjust Termination under Law 100

■ Law 100, Puerto Rico's general employment discrimination statute, prohibits employment discrimination on the basis of gender. P.R. Laws Ann. tit. 29 § 146. Plaintiff bears the burden of establishing a *prima facie* case of discrimination under Law 100 by "(1) demonstrating that he was actually or constructively discharged, and (2) alleging that the decision was discriminatory." *Hoyos v. Telecorp Comm., Inc.,* 488 F.3d 1, 6 (1st Cir.2007) (citing *Velazquez–Fernandez v. NCE Foods, Inc.,* 476 F.3d 6, 11 (1st Cir.2007)). Once that undemanding burden is met, the employer must show "by a preponderance of the evidence that the discharge was made for good cause as contemplated by Law 80." *Id.* Under Law 80, good cause for dismissal is "related to the proper and normal operation of the establishment." *Id.* (Internal citations omitted); *see also*, P.R. Laws Ann. tit. 29 § 185b; *Rivera Torres v. Pan Pepin, Inc.,* 161 D.P.R. 681, 688–690 (2004).

Section 2 of Law 80 provides a non-exhaustive list of circumstances that constitute just cause for termination. Among others, these circumstances include: a) that the worker indulges in a pattern of improper or disorderly conduct; b) the attitude of the employee in not performing his work in an efficient manner, or doing it belatedly and negligently or in violation of the standards of quality of the product produced or handled by the establishment; and c) the employee's repeated violations of the reasonable rules and regulations established for the operation of the entity, provided a written copy of the rules and regulations has been opportunely furnished to the employee. P.R. Laws Ann. tit. 29 § 185b(a)-(c). The court has previously held that violations of an employer's instructions may constitute good cause under Law 80. *See Menzel v. Western Auto Supply Co.,* 662 F.Supp. 731, 744–45 (D.P.R.1987) (finding that plaintiff's failure to follow his supervisor's instructions, repeated violations of the Company's policies, and the repeated nature of plaintiff's deficient performance constituted just cause for plaintiff's dismissal under Law 80.)

■ The record shows that American has met its burden of proving, by a preponderance of the evidence, that it had just cause to terminate Rosado. Rosado's lack of compliance with the re-testing procedures and his failure to follow instructions to meet with supervisors to discuss his suspension resulted in a breach of the Agreement for Conditional Reinstatement, and entitled American to activate his Letter of Resignation.[3] Because American

---

**3.** For a violation of rules to constitute just cause for discharge, the employer must show that the rules were reasonable, that the employee was provided with a written copy of the rules, and that the employee violated the rules repeatedly. *See Rivera Aguila v. K–Mart de Puerto Rico,* 23 P.R. Offic. Trans. 524 (P.R. 1989.) Although Law 80 generally refers to multiple episodes of misconduct as constituting good cause, it "... does not invariably require repeated violations, particularly where an initial offense is so serious, or so reflects upon the employee's character, that the employer reasonably should not be expected to await further occurrences." *Hoyos,* 488 F.3d at 6 (internal citations omitted.) In this case, American's regulations requiring a drug and alcohol-free workplace are clearly reasonable and Rosado was provided with a copy of the company policy. (*See* Docket No. 64–3 at 2.) Rosado relapsed into drug abuse numerous times, and even admitted to having used drugs on the job. (Docket No. 64–7 at 1–9.) Rosado was given opportunities to meet with his supervisors to discuss his suspension from service, the failure of which, Rosado was informed, would be considered

has carried its burden, "the burden of persuasion shifts back to the employee to demonstrate that the discharge was motivated by discrimination." *Hoyos*, 488 F.3d at 6; *see also Velazquez–Fernandez*, 476 F.3d at 11.

Rosado has provided no evidence from which the Court could draw that gender discrimination was the real cause of his termination. *See Hoyos*, 488 F.3d at 6 (affirming district court's dismissal of plaintiff's claim of unlawful termination because of gender where plaintiff did not show that "his dismissal was the result of gender discrimination"); *see also Velazquez–Fernandez*, 476 F.3d at 11 (dismissing plaintiff's claims for age discrimination under the ADEA and Law 100 where "there is simply no basis to infer that the legitimate business decisions made by [plaintiff's] employer were motivated by age animus.")

In fact, Rosado testified in his deposition that "[t]he reason for my termination was not because of my sex. What motivated or what prompted my termination was the 30–minute test ... I knew that by failing this test that I was going to be severely punished by this company." (Docket No. 64–5 at 81.) Moreover, Rosado alleges in his response to American's motion that if this Court finds that Rosado's termination

was justified, then the Court should also find that "the disparate, disparaging and hostile work environment to which he was subjected by the constant offensive jokes and insults of his supervisors and co-workers constituted an adverse employment action in and of itself." (Docket No. 69 at 36.) The Court will address Rosado's hostile work environment claims in the next section. The Court finds that Rosado has failed to meet his burden of showing that he was not fired for good cause and that his dismissal was the result of gender discrimination, therefore dismissal of Rosado's claims under Law 100 is **GRANTED**.

## B. Hostile Work Environment under Laws 17 and 100

■ Rosado alleges that he was subjected to a hostile work environment in violation of Laws 17 and 100. "Courts have agreed that the pertinent substantive law on hostile work environment is essentially the same under Title VII and Commonwealth Law 17, Law 69, and Law 100."[4] Plaintiff's argument that the standard for sexual harassment under Law 17 is "fundamentally different" from that under Title VII is unsupported by any relevant case law. (*See* Docket No. 69 at 40–42.) Indeed, plaintiff earlier states in his brief that "the substantive law of Puerto

insubordination. Thus, Rosado's failure to comply with re-testing procedures and follow instructions of his supervisors resulted in his termination for just cause.

4. *Rivera v. DHL Solutions*, No. 07 C 1950, 2010 WL 728347, at \*3 (D.P.R.2010) (internal citation omitted); *see Hernandez–Loring v. Universidad Metropolitana*, 233 F.3d 49, 52 (1st Cir.2000) ("Nevertheless, the substantive law of Puerto Rico on sexual harassment appears to be aligned, so far as pertinent here, with Title VII law, and Title VII precedents are used freely in construing Commonwealth law."); *Figueroa Garcia v. Lilly Del Caribe, Inc.*, 490 F.Supp.2d 193, 212 (D.P.R.2007) (stating that "Law 17, Law 69, and Law 100

serve virtually identical purposes and outlaw virtually identical behaviors. Each proscribes sexual harassment in the form of a hostile work environment."); *Valentin–Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 101 (1st Cir.2006) ("But except for the fact that Law 17 expressly allows for individual liability, Puerto Rico interprets Law 17 as congruent with Title VII."); *Garcia v. V. Suarez & Co.*, 288 F.Supp.2d 148, 161 (D.P.R.2003) (noting that Law 17 "conforms to the Title VII requirements for sexual harassment and hostile work environments."); *Landrau Romero v. Caribbean Restaurants, Inc.*, 14 F.Supp.2d 185, 193 (D.P.R.1998) ("Law 17 calls for a totality of the circumstances analysis parallel to that of Title VII.")

Rico on sexual discrimination and sexual harassment is aligned, so far as pertinent here, with Title VII law, and Title VII precedents are used freely in construing Commonwealth law." (Docket No. 69 at 28) (citing *Rodriguez Hernandez v. Miranda Velez*, 132 F.3d 848, 854 (1st Cir. 1998)). Because Rosado has not offered any binding precedent for its assertion that claims for sexual harassment under Law 17 should be addressed under a different standard than that of Title VII, and because the law in the First Circuit and this District has been clear that the laws, are in fact, aligned, the Court will proceed to analyze Rosado's hostile work environment claims under a Title VII framework.[5]

■ To succeed in a hostile work environment claim under Title VII, the plaintiff must show the following: "(1) that she (or he) is a member of a protected class; (2) that [he] was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established." *Valentin–Almeyda*, 447 F.3d at 94 (citing *O'Rourke*

*v. City of Providence*, 235 F.3d 713, 728 (1st Cir.2001)).

## 1. Discrimination Based on Gender Stereotyping

■ The Supreme Court has addressed the issue of whether men are a protected class under Title VII and has held that "[s]ex discrimination consisting of same-sex sexual harassment is actionable under Title VII." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 75–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (plaintiff must show that alleged harassing conduct was not just marked by "offensive sexual connotations," but actually amounted to discrimination because of sex.) The "critical issue" under Title VII is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80, 118 S.Ct. 998 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

Rosado claims that because he did not fit the social stereotypes of masculinity, he was subjected to a hostile work environment and discriminated against and harassed because of his sex.[6] *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir.1999); *Ayala–Sepulveda v. Municipality of San German*, 661 F.Supp.2d 130, 136 (D.P.R.2009).

5. The Court notes that plaintiff has referred to several cases in his pleadings that are untranslated Spanish language decisions of the Puerto Rico Supreme Court. This Court will not consider those documents for the purpose of analyzing the hostile work environment claim because plaintiff had the obligation to provide the district court with a certified English translation of the decisions and failed to do so. *See Puerto Ricans for Puerto Rico Party v. Dalmau*, 544 F.3d 58, 67 (1st Cir.2008).

6. Rosado presents his gender stereotyping argument in the context of a hostile work environment under Law 100; the Court sees fit, however, to address the hostile work environment claims under both Law 100 and Law 17 congruently, because Law 17's express prohibition on sexual harassment serves the same purpose as Law 100 and the laws are aligned with that of Title VII. *See Miro Martinez v. Blanco Velez Store, Inc.*, 393 F.Supp.2d 108, 114–15 (D.P.R.2005) (internal citations omitted); *see also* FN 3.

American argues that any of the alleged offensive comments made to Rosado were because of his sexual orientation, and not "because of sex." The First Circuit Court of Appeals has denounced harassment because of sexual orientation as being a "noxious practice, deserving of censure and opprobrium"; regardless, Title VII does not proscribe harassment because of sexual orientation. *Higgins,* 194 F.3d at 259 (internal citations omitted).

The Court echoes the sentiment of its sister court that the line "between discrimination because of sexual orientation and discrimination because of sex is hardly clear." *Centola v. Potter,* 183 F.Supp.2d 403, 408 (D.Mass.2002).[7] Rosado would like for the Court to follow suit and hold that, like the plaintiff in *Centola,* Rosado was harassed both because he was homosexual and because he failed to meet his coworkers' gender stereotypes of what a man should look like or act like. *See Centola,* 183 F.Supp.2d at 409. Like the plaintiff in *Centola,* Rosado was perceived by his alleged harassers as failing to meet their standards of masculinity precisely because he dated men, not women. It is conceivable that a reasonable juror could find that Rosado was discriminated on the basis of sex, "due to his failure to conform with sexual stereotypes about what 'real' men do or don't do." *Centola,* 183 F.Supp.2d at 410. American points out that Rosado repeatedly admitted in his deposition that he was harassed because of his sexual orientation, and admitted that

he did not feel harassed by his coworkers until the year 2000, when his coworkers learned that he was homosexual. (*See* Docket No. 64–5, Pages 62–65, 82.) Though compelling, these admissions are not dispositive because it is possible Rosado was discriminated on the basis of both his sex and his sexual orientation. The Court, however, need not come to a decision on this issue. Even assuming Rosado could state a claim for hostile environment sexual harassment because he was discriminated against based on his sex, we find that Rosado cannot ultimately prevail on his claim because he cannot establish any basis for employer liability.

## 2. Affirmative Defense Against Employer Liability

Employer liability for a hostile work environment claim depends on whether the alleged harassers are supervisors or merely coworkers. Rosado alleges that he was subjected to a hostile work environment by "several supervisors." (Docket No. 69, Page 44.) An employer is subject to vicarious liability when a plaintiff alleges that a supervisor created a hostile work environment unless the employer can satisfy the elements of an affirmative defense. Under the *Faragher/Ellerth* defense, an employer must prove, by a preponderance of the evidence, "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take

---

7. The District Court in *Centola* denied defendant's motion for summary judgment in favor of plaintiff, who was a homosexual but had never disclosed his sexual orientation to anyone at work, and had provided sufficient evidence to support his claim that his coworkers subjected him to a hostile work environment because "he failed to meet their gender stereotypes of what a man should look like, or act like." *Id.* at 409–10. *But see Ayala–Sepulveda,* 661 F.Supp.2d at 137 (court dismissed a homosexual plaintiff's claim for sexual harassment under Title VII where defendants knew of plaintiff's sexual orientation, knew he had an affair with another man, and adverse employment actions were taken against plaintiff as a consequence of his failed relationship with the man, noting that the plaintiff's claim of discrimination was based on "his sexual orientation, not because of any other trait that is sex or gender related.")

advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Reed v. MBNA Marketing Systems, Inc.*, 333 F.3d 27, 32 (1st Cir.2003). The affirmative defense is not available "when the supervisor's harassment culminates in a tangible employment action ..." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).[8]

■ In support of the first prong of the defense, that "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior", American has provided evidence that it had in place a policy that explicitly prohibits unlawful harassment and provides a mechanism for employees to report such harassment. (Docket No. 64–3 at 28.) The policy stipulated that a victim of harassment could report the conduct to his supervisor, his division Personnel Manager, the Manager Affirmative Action at HDQ, or through the anonymous AMR Business Abuse Hotline. *Id.* American also demonstrated that Rosado was provided with American's Policy Statement Against Unlawful Harassment, and that he read, understood and signed the policy. (*Id., see also* Docket No. 64–5 at 70.) American has satisfied the first prong of the affirmative defense as a matter of law. *See Landrau Romero v. Caribbean Restaurants, Inc.*, 14 F.Supp.2d 185, 192 (finding that defendant had satisfied the first prong where there was no genuine issue of

material fact regarding the fact that defendant had an antiharassment policy and complaint procedure in place); *Reed,* 333 F.3d at 35 (finding that defendant had satisfied the first prong of the defense where plaintiff could not show that defendant "lacked a substantial antiharassment program").

The second prong of the defense requires the employer to show that the "plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer." Rosado admitted that he never reported any incidents of harassment to the Human Resources department or through the anonymous hotline. (Docket Nos. 69–1; 64–5 at 71.) Rosado claims that he made a written complaint to Fuentes in 2001, but that he withdrew the complaint because he feared for his safety and his life. (Docket No. 74–2 at 24.)[9] Fuentes testified that she had no knowledge of any sexual harassment complaint Rosado had filed with American. (Docket No. 81–1 at 51.) Mila, the Human Resources Senior Specialist, declared under penalty of perjury that Rosado never reported any harassment to her or anyone in the HR department. (Docket No. 64–2 at 6.) Rosado further admitted that he never complained about sexual harassment to anyone at American after 2001. (Docket No. 74–2 at 26–27.) He testified that he complained once to his Union about sexual harassment even though, according to

---

**8.** Plaintiff has not raised an objection to American's use of the affirmative defense based on the fact that he was terminated. However, even if plaintiff had raised such an objection, we find that plaintiff's termination was based on a legitimate business reason without pretext and was not an "illegitimate" employment action related to his alleged harassment. Thus, American retains its ability to raise an affirmative defense under the *Faragher/Ellerth* doctrine. *See Reed,* 333 F.3d at 32.

**9.** Rosado testified that he "started receiving threats from all of them to the effect that they were going to beat me up; that if I went to the bathroom, to be careful because they were going to beat me up; to take care of my car in the parking lot, that they were going to damage it." (Docket No. 74–2 at 24.) His partner, Jorge Mendez, confirmed that Rosado had expressed to him that he felt threatened by his coworkers and "feared for his safety because of the way that his coworkers would tell him the jokes, the anger that they said it with." (Docket No. 74–29 at 10.)

American's policy, the Union was not a proper party to which a sexual harassment complaint was to be made. (Docket No. 74–2 at 29–30; 64–3 at 28.)

We find that Rosado's fear of threats are unsubstantiated and insufficient to "counter American's evidence of diligence in instituting and following its own procedures to eradicate sexual harassment in the workplace." *Ortiz v. Hyatt Regency Cerromar Beach Hotel, Inc.,* 422 F.Supp.2d 336, 344 (D.P.R.2006) (finding that plaintiff unreasonably failed to utilize the defendant's complaint procedure where she presented only "bare allegations" of fear of retaliation from coworkers and losing her job.) The Court recognizes that reporting sexually offensive conduct can be an uncomfortable and scary experience for most employees. Because this is ordinarily the case, the regime of sexual harassment law "requires the employee in normal circumstances to make this painful effort *if the employee wants to impose vicarious liability on the employer and collect damages under Title VII.*" *Reed,* 333 F.3d at 35. Other circuits have addressed this very issue, and have found that a "nebulous fear" of retaliation is not a valid basis for an employee to remain silent. *See Matvia v. Bald Head Island Management, Inc.,* 259 F.3d 261, 270 (4th Cir.2001) (plaintiff's feared retaliation from co-employees was insufficient to deprive defendant of the affirmative defense, because the "bringing of a retaliation claim, rather than failing to report sexual harassment, is the proper method for dealing with retaliatory acts."); *Shaw v. Auto-Zone, Inc.,* 180 F.3d 806, 813 (7th Cir.1999) ("an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment.") The types of cases in which courts have deemed an employee's inaction to be reasonable generally involve instances where the victim-

ized employee's reluctance is based on some legitimate fear that he would suffer an adverse employment action as a result of filing a complaint. *See Reed,* 333 F.3d at 36; *see also Mota v. University of Texas Houston Health Science Center,* 261 F.3d 512, 516 (5th Cir.2001); *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 64–65 (2nd Cir.1998). Here, Rosado's fear of retaliation was unreasonable and insufficient to justify his failure to notify American of the alleged sexual harassment. Rosado had available to him four different mechanisms through which he could have reported the alleged harassment he faced, including an anonymous hotline, which he never utilized. The Court finds that American has provided the Court with evidence that it had in place a "mechanism for reporting and resolving complaints of sexual harassment [that was] available to the employee without undue risk and expense," including access to an anonymous hotline, and that Rosado unreasonably failed to avail himself of American's preventative mechanisms. *Faragher v. City of Boca Raton,* 524 U.S. 775, 806–7, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). We find that Rosado would be unable to prevail in his hostile environment claim in light of the affirmative defense successfully raised by American. Thus, dismissal for Rosado's hostile environment claims under Law 100 and Law 17 is **GRANTED.**

## IV. Claims Under Law 80

### A. "Good Cause" Under Law 80

█ Rosado claims that he is entitled to salary and additional compensation in accordance with Puerto Rico Law 80. Law 80 provides a remedy in the event of employee termination without just cause. *See Hoyos v. Telecorp Communications, Inc.,* 488 F.3d 1, 6 (1st Cir.2007); *Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling, Co.,* 152 F.3d 17, 28 (1st Cir.1998). Under Law 80, once an employee proves that he

or she was discharged and alleges that his dismissal was unjustified, his or her employer must establish by a preponderance of the evidence that the discharge was for good cause. Good cause for dismissal is "related to the proper and normal operation of the establishment." *Hoyos*, 488 F.3d at 6; *see also*, P.R. Laws Ann. tit. 29 § 185b.

## B. Preemption of Rosado's Law 80 Claim

 Defendants argue that plaintiff's claim is "a claim that American violated rights defined in or dependent on the negotiated collective bargaining agreement between American, plaintiff, and his union" and is thus preempted by the Railway Labor Act ("RLA"). (Docket No. 12 at 7–8.) American therefore contends that this Court has no jurisdiction to adjudicate the claim because "the determination whether his discharge was for 'just cause' requires interpretation of the TWU Agreement and is a 'minor dispute' for the purposes of the RLA." *Id.* Plaintiff responds that an exception to RLA preemption exists when there is a "purely factual question" that does not require interpretation of the collective bargaining agreement, and he argues that his case "lies squarely within" that area. (Docket No. 37 at 5–6.)

The key issue in this case is whether the resolution of Rosado's Law 80 claim hinges upon an interpretation of the collective bargaining agreement ("CBA") between plaintiff, American, and plaintiff's union. *See Adames v. Exec. Airlines, Inc.*, 258 F.3d 7, 11 (1st Cir.2001) (citing *Flibotte v. Penn. Truck Lines, Inc.*, 131 F.3d 21, 26 (1st Cir.1997); *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 253, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994)). The RLA preempts plaintiff's Law 80 claim if "the asserted state-law claim plausibly can be said to depend upon the meaning of one or more provisions within the collective bargaining agreement." *Id.* (citing *Flibotte*, 131 F.3d at 26.) There are some "state law claims [that] may exist independently of the CBA," however, and " 'purely factual questions' about an employee's conduct or an employer's conduct and motives do not 'require a court to interpret any term of a collective-bargaining agreement.' " *Id.* at 11–12 (citing *Norris*, 512 U.S. at 261, 114 S.Ct. 2239).

"[W]hether the factual predicate triggering application of the relevant Commonwealth labor law requires interpretation of the CBA. If so, the claim is preempted by the RLA." *Id.* at 13; *see also Vargas v. Geologistics Americas, Inc.*, 284 F.3d 232, 234 (1st Cir.2002) ("The task before us is to review the arguments of plaintiffs ... in the light of the allegations of the complaint to see whether any state law claims are founded on the CBA or involve interpretation of the CBA.") [10] Similar to the appellees in *Vargas*, plaintiff Rosado claims that he is entitled to severance pay in accordance with Puerto Rico Law 80.[11] "This

---

**10.** The Court recognizes that although the applicable law in *Vargas* was the LMRA, and the RLA and the LMRA are not identical, the common purposes of the two statutes and the parallel development of RLA and LMRA preemption law support the application of the Court's reasoning in *Vargas* to this case. *See Norris*, 512 U.S. at 263, n. 9, 114 S.Ct. 2239 (1994).

**11.** Rosado attempts to distinguish this case from *Vargas* because "[n]o law, federal or Puerto Rican, was cited in the [*Vargas*] com-

plaint[,] ... [and] plaintiffs in *Vargas* were literally and explicitly seeking compensation for violations of the CBA and their contractual rights, and not for violation of their independent state law rights." (Docket No. 37 at 8.) Like the appellees' claim in *Vargas*, however, Rosado's Law 80 claim also requires the Court to interpret and/or apply the CBA. The First Circuit Court of Appeals, in reviewing the arguments of the plaintiffs "to see whether any state law claims are founded on the CBA or involve interpretation of the CBA,"

law mandates some compensation in the event of employment termination 'without just cause.' But a determination of just cause presupposes an analysis of the rights and duties imposed by the CBA. Moreover, even in the event that a termination found not to be in violation of the CBA could otherwise be adjudged without just cause under Law 80, the uncertainty caused by the application of two systems of law would undermine the policy of uniformity in labor law administration." *Vargas*, 284 F.3d at 235 (citing *Beidelman v. Stroh Brewery Co.*, 182 F.3d 225, 231–2 (3rd Cir.1999)). In accordance with the First Circuit Court of Appeal's ruling in *Vargas*, this Court finds that plaintiff's Law 80 claim is preempted by the RLA. Thus, dismissal for Rosado's Law 80 claim is **GRANTED.**

## V. Breach of Confidentiality under Puerto Rico Civil Code Article 1054

 Rosado claims that American, through the acts of Fuentes, breached its confidentiality obligations to him by disclosing his HIV-positive status to his co-workers. (Docket No. 69 at 47.) American alleges that it did not consent to any contract whereby it bound itself not to divulge Rosado's HIV-positive status, nor did Fuentes have authority to bind American to a contract. Rosado cites no case law supporting his far-fetched argument that American consented to a contract where it bound itself not to divulge Rosado's HIV-positive status. Nor does Rosado provide any factual or legal support for his claim that Fuentes had authority to bind American to such a contract. This Court will not entertain plaintiff's claims that are unsupported by any legal analysis.

addressed several of plaintiff's propositions for avoidance of federal preemption pursuant to § 301 of the Labor Management Relations Act ("LMRA"). One such proposition was plaintiff's "claim that they are entitled to severance pay in accordance with Law 80 of May

*See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). Thus, dismissal of plaintiff's claim for breach of confidentiality is **GRANTED.**

## VI. CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendant's motion for summary judgment and **DISMISSES this case, WITH PREJUDICE.**

Judgment will be entered accordingly.

**IT IS SO ORDERED.**

30, 1976, 29 P.R. Laws Ann. § 185b," which is the same proposition plaintiff Rosado makes in this case. The Court therefore finds *Vargas* to be the appropriate standard under which to analyze the motion for summary judgment on plaintiff's Law 80.